James NUTALL, a/k/a Willie James Nutall, Petitioner-Appellant,

v.

Jim GREER, Warden, Respondent-Appellee.

No. 83–2780.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1985.

Decided June 11, 1985.

Alan Raphael, Loyola University School of Law, Chicago, Ill., for petitioner-appellant.

James V. Cinotto, Asst. Atty. Gen., Springfield, Ill., for respondent-appellee.

Before ESCHBACH, POSNER, and COFFEY, Circuit Judges.

ESCHBACH, Circuit Judge.

In 1979 James Nutall was convicted of murder in the Circuit Court of Cook County, Illinois, and was sentenced to twenty-two years imprisonment. He is now a prisoner at Menard Correctional Center, Menard, Illinois. He appeals from the magistrate's denial of his petition for a writ of

habeas corpus under 28 U.S.C. § 2254. He contends that the trial court erred in failing to instruct the jury on death by accident and that he received ineffective assistance of counsel. We affirm.

## I

On September 1, 1978, Nutall was employed as a security guard. Wearing his guard uniform and carrying a gun in a holster, he met Linda Williams at a Chicago hotel, where she was seeking work. He had known Williams for nine months and had been seeing her, but they had broken up a few days before. They took an elevated train to Homan and Lake and were waiting on the corner for a bus. Suddenly a shot rang out. Two eyewitnesses saw Williams fall to the ground. Nutall backed up, turned around, started running, and disappeared down an alley. Williams later died of a bullet wound to the head. The fatal bullet came from Nutall's gun.

Nutall was indicted for Williams's murder and was convicted following a jury trial. He appealed to the Illinois Appellate Court, which affirmed his conviction. *People v. Nutall*, 91 Ill.App.3d 758, 47 Ill.Dec. 623, 415 N.E.2d 628 (1980). He did not file a petition for leave to appeal to the Illinois Supreme Court.

On July 20, 1982, Nutall filed this petition for a writ of habeas corpus. The case was referred to a magistrate, and the parties agreed to let the magistrate enter final judgment. The magistrate granted Nutall's motion for leave to proceed in forma pauperis but denied his motion for appointment of counsel. Without holding an evidentiary hearing, the magistrate granted the respondent's motion to dismiss on August 23, 1983. Nutall now appeals that order.

## II

### A. **Waiver**

Nutall challenges the magistrate's ruling that he had waived his right to a writ of habeas corpus by failing to seek leave to appeal to the Illinois Supreme Court.

Whether the failure to seek review in the state's highest court, having taken one appeal to the state's lower level appellate court, constitutes such a waiver is apparently an issue of first impression in this circuit, and we have found no case deciding that precise question in any other circuit.

The question is not the same as whether Nutall has exhausted his state remedies, as required by 28 U.S.C. § 2254(b); it is clear that he has. The exhaustion requirement refers only to state remedies still available at the time the federal petition is filed. *United States ex rel. Johnson v. McGinnis*, 734 F.2d 1193, 1196 (7th Cir.1984). By the time Nutall filed his federal petition, the time for filing a petition for leave to appeal to the Illinois Supreme Court had long passed. *See* Ill.Rev. Stat. ch. 110A, ¶¶ 315(b), 612(b) (1981). Since he chose the route of direct appeal, he need not have sought collateral relief in state court, *Brown v. Allen*, 344 U.S. 443, 447–48, 73 S.Ct. 397, 402, 97 L.Ed. 469 (1953), *overruled on other grounds, Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Cronnon v. Alabama*, 557 F.2d 472, 473 (5th Cir.1977), and in any event is barred from doing so by state rules. *People v. Logan*, 72 Ill.2d 358, 369, 21 Ill.Dec. 186, 381 N.E.2d 264, 269 (1978).

If it were still open to Nutall to seek leave to appeal in the Illinois Supreme Court, then his petition for a writ of habeas corpus would be subject to dismissal for failure to exhaust state remedies. *Carothers v. Rhay*, 594 F.2d 225, 228 (9th Cir. 1979). This rule reflects the principles of federalism and comity that restrain federal habeas corpus review of state convictions. State courts must have a fair opportunity to consider constitutional objections to state criminal convictions before a federal court assumes the intrusive power to nullify those convictions on constitutional grounds. This policy is not well served if a federal court accepts cases for habeas review when the state's highest court has had no opportunity to express its views on the questions presented. If the prisoner is still permitted under state rules to seek

review in the highest court, the federal court is required to dismiss the petition for failure to exhaust state remedies. Such a dismissal is without prejudice; if the highest court declines review or rules against the prisoner, he may apply again for habeas relief. *See Carbajol v. Fairman*, 700 F.2d 397, 399 (7th Cir.1983). But if the prisoner by his own default is no longer permitted under state rules to seek review in the highest court, then, subject to the exception to be developed below, we think the very same policy requires that he be deemed to have waived his right to habeas relief on grounds that he might have presented but did not present to the highest court.

Just as there are exceptions to the exhaustion rule,[1] we think there may be cases in which this waiver rule should be relaxed. Citing *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), Nutall suggests that the only proper case for invocation of the rule is one in which the defendant deliberately bypassed the highest state court as a matter of intentional strategy, with all other cases treated as exceptions.[2] Such a view comports with the classic definition of waiver as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). But that is not the concept of waiver we employ when considering whether a state convict has waived certain constitutional objections to his conviction. Our search in such contexts is for rules determining when it is proper to treat the convict as having *forfeited* his right to habeas

relief. Our use of the word "waiver" does not mean that we necessarily restrict the legitimate grounds for such forfeiture to waiver in the classic sense. *See Carbajol v. Fairman*, 700 F.2d 397, 399 (7th Cir. 1983).

We agree that cases of deliberate bypass or waiver in the classic sense should be within the rule, but we think that the policies of comity and federalism that underlie the rule require that it have a broader sweep. For example, some defendants may fail to appeal to the highest court not from any deliberate strategy but from simple inexcusable neglect. Such defendants bear the responsibility for their own default and do not present a compelling case for overriding the principle that a federal court should not intrude in a state's criminal process when the state's highest court has had no opportunity to rule on the constitutional issues presented. Accordingly, we think that the appropriate standard for exceptions to the waiver is the cause-and-prejudice rule of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).[3]

In *Sykes* the Supreme Court held that federal habeas corpus is not available to review a state convict's claim of a constitutional violation in his trial if the state courts have refused to consider the claim because of his noncompliance with the state's contemporaneous objection rule, unless he shows cause for the noncompliance and prejudice from the alleged violation. 433 U.S. at 87, 97 S.Ct. at 2506. In adopting this rule, the Court intended that federal courts honor state contemporaneous ob-

---

**1.** An exception to the exhaustion rule is made if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief. *Duckworth v. Serrano*, 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981).

**2.** In *Fay v. Noia* the Court affirmed the granting of a writ of habeas corpus to a state prisoner who was denied state post-conviction relief because his coerced confession claim had been decided against him at trial and he had failed to appeal. The Court held that a state court's finding of waiver does not bar independent determination of the question by the federal habeas

court and that the proper federal test for waiver is whether the petitioner, by his own considered choice, deliberately bypassed his direct appeal. 372 U.S. at 439, 83 S.Ct. at 849.

**3.** Since *Fay v. Noia* dealt with failure to appeal, while *Wainwright v. Sykes* dealt with failure to observe a contemporaneous objection rule at trial, it might be argued that *Fay v. Noia* provides the proper test for waiver in failure-to-appeal cases, such as this one. We provided a thorough analysis in support of our rejection of this argument in *United States ex rel. Spurlark v. Wolff*, 699 F.2d 354, 357–61 (7th Cir.1983) (en banc), also a failure-to-appeal case.

jection rules, because of the manifold benefits such rules confer on the criminal process at the trial and appellate levels. *See id.* at 88–90, 97 S.Ct. at 2507–08. The cause-and-prejudice exception was appended to enable a federal habeas court to decide a constitutional claim otherwise barred by the rule when failure to decide the claim would result in a miscarriage of justice. *Id.* at 90–91, 97 S.Ct. at 2508. We would likewise not apply our waiver rule if it would result in a miscarriage of justice, and we think the cause-and-prejudice test adequately articulates this exception. Accordingly, we hold that a convicted state prisoner who fails to seek leave to present to the highest state court the constitutional objections that form the basis of his federal habeas petition waives those objections unless he can show cause for his default and prejudice from the alleged constitutional infirmities.

Our holding today harmonizes with similar results in our recent habeas decisions. In *United States ex rel. Spurlark v. Wolff,* 699 F.2d 354 (7th Cir.1983) (en banc), we held that a state prisoner who fails to present a constitutional claim in his direct appeal forfeits federal habeas review of the claim, unless he shows cause and prejudice. In *Williams v. Duckworth,* 724 F.2d 1439 (7th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 143, 83 L.Ed.2d 82 (1984), we held that a state prisoner who fails to raise in his post-conviction petition an issue that could not have been presented on direct appeal waives his right to present the issue in federal habeas proceedings, unless he shows cause and prejudice. Indeed, our holding complements *Spurlark:* a state prisoner waives habeas review of a claim not only by failing to present it to the lower appellate court on direct appeal but also by failing to seek leave to present it to the highest state court, having taken a direct appeal. In either case, the cause-and-prejudice exception is available to prevent a miscarriage of justice.

**B. Cause**

 Nutall's private counsel failed to file a petition for leave to appeal to the Illinois Supreme Court. The record does not disclose any reason for this failure, nor was the question considered at the motion hearing before the magistrate, of which there is no record. Nutall argues to us that he relied on counsel to protect his right to appeal and to seek collateral relief. This suggests ineffective assistance of counsel, one of the grounds on which he seeks habeas relief. But even if there is merit in his contention that his trial counsel was ineffective, he had different counsel on appeal, and he makes no general charge that appellate counsel was ineffective. Assuming that ineffective assistance of appellate counsel would be adequate cause for Nutall's default, we cannot find such ineffective assistance on the present record. There is no evidence that Nutall directed his appellate counsel to seek leave to appeal or that counsel gave him assurances. Appellate counsel may have decided to forgo a further appeal for want of an appealable issue. Such tactical decisions are not per se ineffective assistance of counsel. *See Clay v. Director,* 749 F.2d 427, 436 (7th Cir.1984) (Posner, J., concurring), *cert. denied,* — U.S. —, 105 S.Ct. 2344, 85 L.Ed. 858 (1985).

The record on this question, however, is undeveloped. Since Nutall appeared pro se below and the magistrate did not raise the question of cause or advert to it in his opinion, we shall not base our holding on the absence of cause. We affirm the magistrate's decision nevertheless, because Nutall has shown no prejudice.

**C. Prejudice**

1. Ineffective Assistance of Counsel

 Nutall contends that he was denied due process of law at his trial because his counsel was ineffective. As proof he cites the following acts and omissions: counsel made only one brief pretrial motion, he made no effort in limine to suppress a holster, his opening statement was brief and failed to present Nutall's theory of accident, he did not cross-examine either eyewitness, he made no meaningful cross-

examination of other witnesses, he did not challenge any state witness's testimony, he did not highlight the inconsistencies and weaknesses in the state's case, he made only one objection during trial (to the admission of the holster), he tendered no instruction on the defense's theory of the case, and he made no closing argument.

■ In *Strickland v. Washington*, — U.S. ——, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984), the Supreme Court has declared that the proper standard for attorney performance is that of reasonably effective assistance under prevailing professional norms; more specific guidelines are not appropriate. In applying this standard, we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance but keep in mind that counsel's function is to make the adversarial testing process work. *Id.* 104 S.Ct. at 2065–66. Furthermore, errors of counsel do not constitute ineffective assistance unless they are prejudicial to the defense. *Id.* at 2067. There must be a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 2068.

The performance of Nutall's counsel appears to have fallen short of the ideal of vigorous and zealous advocacy of the defendant's cause. Nevertheless, under the principles of *Strickland v. Washington,* we cannot find that it was so prejudicially deficient as to constitute ineffective assistance of counsel. The particular instances of deficient performance Nutall presents are all in the character of failures to act. Most of the instances are without force because Nutall does not suggest how he was prejudiced by them. In pointing out that counsel made only one pretrial motion he implies that counsel should have made more, but he does not say what pretrial motions counsel ought to have made that might have affected the outcome of the

case. It is clear that the failure to seek suppression of the holster had no effect; when the state offered the holster, Nutall's counsel objected but he was overruled. A brief opening statement may have been deliberate strategy, and in any event counsel did say that the death was accidental. Nutall thinks that his counsel should have cross-examined the eyewitnesses, but he does not say in what respect their testimony was vulnerable or how they might have been impeached. Counsel may have concluded that cross-examination would accomplish nothing and might even aid the prosecution by revealing the witnesses to be unshakeable. Similarly, Nutall does not say how more vigorous cross-examination of the other witnesses might have affected the result, or what challenges he might have made to the state's witnesses' testimony.[4] He does not point out the inconsistencies and weaknesses in the state's case that went unhighlighted. He notes that counsel made only one objection during the trial but does not say what objections ought to have been made. Failure to tender an instruction on the defense's theory of the case was harmless, *see infra.*

■ Counsel's failure to make a closing argument appears more serious; it is difficult to imagine what tactical advantage he might have seen in forgoing his last and best opportunity to influence the jury's perception of the weight of the evidence and its reasonable implications. Nevertheless, failure to make a closing argument is not ineffective assistance per se; there must be a reasonable probability that the omission affected the outcome. The principal prejudice Nutall sees in the omission is that counsel did not argue the defense of death by accident to the jury. But counsel did elicit Nutall's account of events on direct examination, *see infra;* the theory was clearly placed before the jury.

---

**4.** We are mindful that in showing prejudice from the poor examination of witnesses Nutall is confined to facts in the record. He cannot say specifically what relevant facts could have been brought to light by more vigorous examination, if those facts are not in the record. But he can say that he knows such facts and is prepared to submit competent evidence to prove them in an evidentiary hearing.

If counsel had been totally passive, doing literally nothing in aid of his client's cause, we might infer prejudice without a particularized showing; no assistance at all could hardly be effective assistance. But Nutall's counsel did quite a number of positive acts in furtherance of the defense, many of them in support of Nutall's theory of accident. Before trial he made a discovery motion and filed a response to the state's discovery motion. In his brief opening statement he stated that the defendant was "not contesting" many of the things alleged by the state, but that the evidence would show that Nutall had served in the Marine Corps, that he worked for a security agency, that he and Linda Williams were boyfriend and girlfriend, and that the crime of murder will not be proved because the death was accidental.

He cross-examined Ben Smith, whom Nutall had told of the shooting shortly after it happened, and elicited that Nutall was nervous and upset at the time of the conversation. He cross-examined John Burke, who obtained the spent shell casing, and elicited that the police took it from him without asking him to place any mark on it. Later, he objected to the admission of the shell casing.

He cross-examined Vaughn Washington, an employee of the security firm for which Nutall worked and the person to whom Nutall turned over his gun and equipment on reaching the office after the shooting, and elicited that Washington (who testified on direct that he turned over Nutall's gun and bullet pouch and a holster to police) did not give the police a holster and did not know whether the holster that was a state's exhibit belonged to the firm. Washington also stated that the firm had four weapons and five holsters, one of which was for five-inch weapons. (Nutall's gun was a four-inch.) On recross, Washington stated that if the strap were not on the holster, the weapon could come out.

Nutall's counsel cross-examined Daniel McCarthy, the arresting officer, and elicited that the arrest was made at Nutall's mother's apartment, that she was present at the time, and that Nutall did not try to escape. He cross-examined Dr. Eupil Choi, the pathologist who did the post mortem examination, and elicited that a surgical procedure was performed on Williams before she died, that a portion of the skull had been removed in that procedure, and that there was a gap in the bone area.

At the conclusion of the state's case in chief Nutall's counsel objected to the admission of the holster, on grounds that there was no evidence as to when the state obtained possession of it and that it was not turned in when the other evidence was acquired by the police.

For the defense's case Nutall's counsel called two character witnesses and Nutall himself. He questioned Nutall extensively about his version of the shooting and surrounding events. Nutall testified that while they were waiting for the bus he had his arm around Williams' waist, that she began moving around and the weapon came up, that he removed the weapon so that he could adjust the belt, and that the gun discharged. He denied being upset with her over their breakup. He denied being upset with her when the shot was fired. He denied that he intended to kill her. He testified that his holster was different from the state's exhibit; it did not have a bolt or strap.

In the state's rebuttal, Nutall's counsel cross-examined Mary LeFlore, who testified on direct examination that Nutall had told her a few days before the shooting that he and Williams had had a fight and that he would kill Williams before seeing her with someone else. He elicited from her that she had first mentioned the conversation about two weeks before she was to testify and that she had not told the police about it.

Nutall's counsel also tendered an instruction on involuntary manslaughter. These actions of counsel were not ineffectual.

Nutall argues that because the verdict was only weakly supported by the evidence, counsel's omissions are all the more likely to have affected it. In *Strickland v. Washington* the Supreme Court stated that

a court hearing an ineffectiveness claim must consider the totality of the evidence.... [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

104 S.Ct. at 2069. But we think the evidence in support of guilt was extremely strong. Nutall admitted that the fatal shot came from his gun; the dispositive issue was whether he intentionally fired it. No one saw the shooting, but two eyewitnesses saw Nutall flee the scene, and flight is probative of intent. Nutall admitted breaking up with Williams about one and a half weeks before the shooting. Williams's sister testified that on August 13, two and a half weeks before the shooting, Nutall asked her to try to convince Williams to reconsider marrying him. Another witness testified that on August 20 Nutall told her "that he had gotten high off some pills and him and Linda had a fight," and that "he would kill Linda before he see her with another man." Nutall himself testified that on August 16 or 17 he had been at Williams's house and that police had removed him twice because he was intoxicated. He testified that at the bus stop, just before the shooting, he noticed "passion marks" on her neck and knew that she was going out with someone else.

Furthermore, Nutall's theory of accidental shooting was quite implausible on the evidence. The pathologist testified that the bullet entered Williams's right temple and traveled backwards, leftwards, and downwards. The Assistant Firearms Examiner for the Chicago Police Department testified that the gun could not discharge without at least a three-pound pull on the

trigger and that the safeties were in good working order. Even if the holster lacked a snap, so that the gun was prone to slip out, we are unable to imagine a natural sequence of movements in removing the gun from the holster and adjusting the belt that could result in the accidental infliction of a downward-coursing bullet wound in the head of someone standing nearby.

In the face of this evidence, we do not see what counsel might have done that with reasonable probability could have changed the verdict.[5]

### 2. Jury Instruction

Nutall's counsel failed to tender a jury instruction on Nutall's theory of death by accident. He contends that the court should have given such an instruction sua sponte. We think that a separate instruction on death by accident was not necessary to ensure a constitutionally fair trial. Nutall does not deny that the jury was properly instructed in the elements of the crime of murder and was told that it must find each of those elements beyond a reasonable doubt. One of the elements is the requisite mental state. As the Illinois Supreme Court has said, "[a]n instruction on death by misadventure simply tells the jury that the defendant must be found not guilty if the requisite mental state is lacking." *People v. Witherspoon*, 55 Ill.2d 18, 24, 302 N.E.2d 3, 6 (1973). Such duplication is not necessary for a fair trial.

We therefore hold that Nutall was not prejudiced by the constitutional errors he assigns in his petition. Consequently, he may not be relieved from the waiver of those errors resulting from his failure to

---

**5.** Nutall contends that the magistrate erred in ruling on the issue of ineffective assistance of counsel without reviewing the trial transcript. He argues that because the magistrate relied entirely on the factual summary of the Illinois Appellate Court in *People v. Nutall,* 91 Ill.App.3d 758, 47 Ill.Dec. 623, 415 N.E.2d 628 (1980), and held no evidentiary hearing, we should remand for reconsideration of the effectiveness issue. But we think no remand is necessary. The magistrate held that Nutall waived his right to habeas relief by failing to seek leave to appeal to

the Illinois Supreme Court, a holding that we here affirm. The record includes Nutall's brief to the Illinois Appellate Court, which includes a detailed abstract of the transcript. In making our own determination, we have relied heavily on that abstract, in addition to the facts as stated by the Illinois Appellate Court. Nutall does not say that there are specific facts relevant to the issue of waiver that can be found in the transcript but not in the sources we have used.

seek leave to appeal to the Illinois Supreme Court.

### III

For the reasons stated above, the order of the magistrate denying Nutall's petition for a writ of habeas corpus is

AFFIRMED.