Gary Lee SHOCKLEY, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Nov. 9, 1988.
Decided: Oct. 6, 1989.

Edward C. Gill, of Wolhar & Gill, P.A., Georgetown, for appellant.

M. Jane Brady, Deputy Atty. Gen., Dept. of Justice, Wilmington, for appellee.

Before HORSEY, MOORE, and WALSH, JJ.

HORSEY, Justice:

This criminal case is before the Court a second time. In 1986, this Court affirmed the conviction of the defendant for the stabbing death of his wife. *Shockley v. State*, Del.Supr., 515 A.2d 398 (1986) (Order). The present appeal is from the Superior Court's denial, after evidentiary hearing, of postconviction relief based on the defendant's claim that his constitutional right to counsel was violated. Defendant, Gary Lee Shockley, relies upon a number of irregularities in counsel's representation in support of his claim of ineffective assistance of counsel. Shockley asserts that counsel's deficiencies in the aggregate amount to an actual or constructive denial of his right to counsel. Therefore, he argues, prejudice must be legally presumed. The trial court concluded otherwise and we find no error.

The record confirms that counsel's conduct is in large part attributable to defendant's fluctuating position on representation. We are particularly mindful that a trial judge is in a better position than an appellate court, sitting on its "appellate perch," to determine the adequacy of counsel's representation at trial. *Dutton v. State*, Del.Supr., 452 A.2d 127, 140 (1982). This is especially true when counsel's trial tactics are attributable to counsel's concern over avoiding being a party to perjury.

On the peculiar record before us and the findings of the trial court, following evidentiary hearing, we cannot agree that defen-

dant was deprived of his constitutional right to counsel. In view of the extensive evidence incriminating defendant, we find no reasonable probability that, had counsel not waived both an opening and a closing statement and not permitted defendant to testify in the narrative, defendant would have been found not guilty of his wife's murder. Therefore, we affirm Superior Court's denial of postconviction relief.

## I

The murder occurred on August 27, 1984 in or near Laurel, Delaware. Defendant, Gary Lee Shockley, aged 27, was on a supervised custody release from prison following his conviction for a prior felony. Shockley was staying at Laurel home of his mother, Margaret Taylor. Shockley's wife, Donna, was also staying temporarily at his mother's home. This was contrary to the terms of Shockley's release agreement requiring him to stay apart from his wife. During the two weeks of his release, Shockley and Donna quarrelled frequently. Throughout the weekend of August 25–26 the quarrelling continued. Shockley was drinking heavily and taking drugs at the time. Their arguments reportedly centered on Shockley's marital infidelity and a recent statement by Donna's adolescent sister that Shockley was the father of her expected child.

On Sunday night, August 26, as Mrs. Taylor returned home from work at 11:00 p.m., she heard Donna scream. She found Donna with her clothes in tatters and Shockley bleeding from his arm. Shockley had ripped his wife's clothes and cut his own arms with a knife. Because of the fighting, Mrs. Taylor informed her son that he and his wife were no longer welcome and that she would ask correctional officials to find a different supervised custody home for him. The next morning, Shockley, unable to make it to work and fearful of being returned to jail, went to several neighbors asking them to transport him to a park near Laurel.

At the park Shockley began drinking heavily. Late in the morning, a passing bicyclist who knew Shockley told him that he had recently seen Donna in Laurel. Shockley borrowed the bicycle and stated that he was going to see his wife. He stated that he would return with the bicycle by 1:00 p.m. He did not return to the park until 1:25 that afternoon.

When Mrs. Taylor returned to her house at approximately 1:15 p.m., she found Donna dead on the floor. Donna had been stabbed forty-one times with three different knives. In one corner of the room there was a bloody footprint made by an athletic shoe. A "Purina" knife, which one of Shockley's friends had reportedly "lost" that morning, was also found near the body. Later that afternoon, at the park, Shockley ran when a neighbor, who had heard of the killing, confronted him at gunpoint and asked him to surrender to the police. Several hours later Shockley was apprehended by the police in a nearby woods. The police discovered blood on Shockley's tennis shoes. The blood matched that of his dead wife. During his mother's visit with him at the police station, Shockley attempted to flee. Several months later, Shockley, in a telephone conversation with a friend, admitted killing his wife.

Shockley's trial began September 30, 1985. Defendant, an indigent, was represented at trial by two assistant public defenders, Karl Haller and Howard W. Hudson, Jr.[1] Shockley testified in his own de-

1. Because Shockley's crime was first considered a capital offense, he was appointed two assistant public defenders, Haller and Hudson. Haller assumed the role of lead counsel. Shockley came to mistrust both of his attorneys and requested appointment of new counsel. The trial judge denied Shockley's request, but did allow Hudson to assume the role of Shockley's attorney at trial following the reduction of the charge to a noncapital offense. Shockley initially acquiesced in, if not accepted, Hudson's substitution for Haller; but later, as the trial commenced, and before opening argument, Shockley elected to represent himself. The court then appointed Hudson as stand-by counsel. The trial proceeded under this arrangement through the completion of the State's case-in-chief. The court, out of concern over Shockley's lack of representation, persuaded Shockley to allow Haller to re-enter the case as his attorney; and Haller was *directed* by the court to

fense. Rather than directing questions to the defendant, however, Haller simply permitted Shockley to testify in the form of a narrative, giving his account of the events.

Shockley was convicted by a jury on October 4, 1985 of murder in the first degree, pursuant to 11 *Del.C.* § 636. He was also convicted of three counts of unlawful possession of a deadly weapon during the commission of a felony, pursuant to 11 *Del.C.* § 1447, and one count of possession of a deadly weapon by a person prohibited, pursuant to 11 *Del.C.* § 1448. Shockley was sentenced to imprisonment for the balance of his natural life plus 95 years.

Shockley charges his attorney with ineffective assistance of counsel of constitutional proportions. He contends that his conviction and sentence were obtained in violation of the Sixth and Fourteenth Amendments of the United States Constitution and in violation of Article I, § 7 of the Delaware Constitution. His principal complaints are:

(1) Counsel's failure to question defendant directly about the crime when defendant took the stand at trial;

(2) Counsel's decision not to give an opening or closing statement;

(3) Counsel's introduction of conflicting evidence concerning the appellant's defenses;

(4) Counsel's failure to request a jury instruction on an emotional distress defense;

(5) Counsel's disclosure before trial to the State of two psychiatric exams of the defendant without defendant's permission;

(6) Counsel's failure to render advice on whether defendant should take a blood test; and

(7) Counsel's failure to object to authenticity and identification concerning an incriminating phone call.

Defendant also complains of:

(8) Counsel's failure to sever Count V of the indictment, which charged the defendant with the possession of a deadly weapon by a person prohibited;

(9) Counsel's introducing the prosecutor's opinion as to the defendant's guilt through direct questioning of a defense witness;

(10) Counsel's failure to bring out in testimony any of the defendant's denials of the crime; and

(11) Counsel's failure to pursue zealously an appeal.

## II

We first address Shockley's argument that his defense counsel's representation was so inadequate as to amount to a complete denial of counsel. The benchmark for judging such a claim is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). A court reviewing a claim of ineffective assistance of counsel must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. Shockley must therefore show first " 'that counsel's performance was deficient' and second that 'the deficient performance prejudiced the defense.' " *Perry v. Leeke,* —— U.S. ——, ——, 109 S.Ct. 594, 599, 102 L.Ed.2d 624 (1989), *quoting Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. *See also Nix v. Whiteside,* 475 U.S. 157, 164–65, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986). To establish prejudice, the defendant must show a reasonable probability that but for counsel's errors the outcome of the trial would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

 In examining the reasonableness of counsel's action, we cannot disregard the client's conduct because a client's statements or actions may substantially influence counsel's choices. *Id.* at 691, 104 S.Ct. at 2066. We also recognize that al-

resume his role as Shockley's lead counsel. *See infra* section II–B.

though a defendant has the right to testify in his own defense, *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 2708, 97 L.Ed.2d 37 (1987), he does not have the right to commit perjury, *Nix*, 475 U.S. at 173, 106 S.Ct. at 993. Finally, in reviewing a denial of postconviction relief, our standard of review is abuse of discretion; and our task is to carefully review the record to determine whether competent evidence supports the court's findings of fact and that its conclusions of law are not erroneous. *Albury v. State*, Del.Supr., 551 A.2d 53, 60 (1988).

### A.

Shockley argues that his counsel's failure to follow the norm in questioning him when he took the stand in his own defense constituted ineffective assistance of counsel. Shockley contends that counsel made no attempt to prevent him from committing perjury. Alternatively, defendant argues that counsel possessed insufficient facts to enable him to conclude that Shockley was going to commit perjury. Thus, defendant asserts that counsel's conduct of defendant's direct examination fails to meet both prongs of *Strickland*'s two-prong test; that is: counsel's conduct was not objectively reasonable under *Strickland;* and Shockley was prejudiced thereby. Prejudice occurred, defendant argues, because (a) he was not "humanized" in front of the jury; and (b) his low IQ,[2] compounded by his lack of legal assistance during his testimony, made him inherently unbelievable, without regard to the substance of his testimony.

At the postconviction hearing, defense counsel testified that he had concluded "beyond a reasonable doubt" that Shockley was going to commit perjury. Therefore,

counsel, after consulting with the court, decided that he should refrain from conducting the customary form of questioning on direct examination. Counsel was unsure of what defendant's responses would be. Counsel was also concerned that such form of questioning would inevitably require him to ask defendant the ultimate question—whether he did or did not stab his wife to death.

■ Appellant's claim implicates both constitutional issues and ethical standards. *See generally Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). The starting point for analysis of defendant's constitutional claim must be *Nix*.[3] In *Nix*, the Supreme Court held that an attorney's refusal to cooperate with a defendant in presenting perjured testimony does not amount to a denial of effective assistance of counsel. Applying *Nix*, we conclude that Haller's resort to the narrative as a means of refusing to be a participant with Shockley in perjury was not unreasonable under the circumstances and did not, as a matter of law, deprive Shockley of his Sixth Amendment right to counsel.

Counsel asked the court for guidance on how to avoid being a party to perjury; and the court determined that the best way for counsel to resolve the dilemma of prospective perjury was to permit Shockley to testify in a narrative form without guidance from the lawyer's questioning.[4] The court advised counsel that allowing the defendant to testify in a narrative form "satisfies his constitutional right to counsel and also satisfies the ethical requirements imposed upon defense counsel...."

---

**2.** Shockley's IQ was reported to be 77; he has a tenth grade education.

**3.** In *Nix*, the defendant in a murder case was claiming self defense. The defendant had consistently told his counsel that he had not actually seen the victim holding a gun. On the eve of trial, however, the defendant began to change his story. He said that he had, in fact, seen the victim pull from underneath his pillow something metallic. The attorney informed the defendant that if he chose to so testify, the attorney would reveal the perjury to the court and

ask the court's permission either to withdraw or impeach the defendant's testimony. The defendant accepted his attorney's advice, took the stand, and testified only that he "thought" the victim had a gun.

**4.** The judge stated that the "commentary to Rule 3.3 [of Delaware's Lawyers' Rules of Professional Conduct] refers to three resolutions of this dilemma. One is to permit the accused to testify by a narrative, without guidance by the lawyer's questioning."

Shockley's testimony in the narrative was as follows. He rode a borrowed bicycle to a delicatessen, phoned his brother's home, then rode to his brother-in-law's house to ask if he had seen his wife, Donna. After having been told that his wife was at his mother's house, he rode to the house and hollered at the front door for his wife. When no one answered, Shockley said, he figured his wife wasn't there so he got back on the bicycle and returned to the park.

On this record, we decline to find counsel's decision to permit defendant to testify in the narrative to constitute either a denial of counsel or ineffective assistance of counsel. Stated affirmatively, we find that counsel adequately performed his duty as an officer of the court by disclosing to the court what he believed beyond a reasonable doubt to be his client's proposed perjury. We further find that counsel's resort to the narrative, when defendant exercised his right to take the stand and testify, was reasonable under the circumstances and not clearly prejudicial to defendant's case under *Strickland*.

*Nix* does not, however, answer the ethical question of what a lawyer must do when he knows unequivocally that his client intends to commit perjury; that question is governed by state law. Delaware has adopted the ABA's Model Rules of Professional Conduct. An examination of what these rules require of a lawyer who knows his client is going to commit perjury

serves two purposes in this case. First, in determining whether counsel's assistance was constitutionally defective, the "[p]revailing norms of practice as reflected in American Bar Association ("ABA") standards are [not directives but] *guides* to determining what is reasonable...." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065 (emphasis added). Second, in determining the reasonableness of defense counsel's conduct at trial, we look to the Delaware's Lawyers' Rules of Professional Conduct.

Under the Model Rules, adopted in Delaware in 1985, a lawyer's first duty when he learns his client is going to commit perjury is to seek to persuade the client not to do so. If the client has already presented the testimony, the attorney must rectify any damage. *See The Delaware Lawyers' Rules of Professional Conduct*, Rule 3.3, Comment; *Nix*, 475 U.S. at 169, 106 S.Ct. at 996.[5] If a client insists on giving false testimony, a lawyer may ask leave to withdraw. Rule 1.16(b).[6] Ordinarily, after warning a client of the consequences of perjury, an attorney should not need to withdraw because the client will not usually commit perjury. *See, e.g., United States v. Long*, 8th Cir., 857 F.2d 436, 446–47 (1988). Subject to these limiting guidelines, the lawyer may proceed to permit the client to testify. If a client can reasonably be expected to testify truthfully about certain matters, the lawyer can proceed to

**5.** Rule 3.3, "Candor toward the Tribunal," outlines the specifics of an attorney's duties when he knows that his client has committed or is going to commit perjury. The relevant provisions of Rule 3.3(a) state:

 (a) A lawyer shall not knowingly:

 \* \* \* \* \* \*

 (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

 \* \* \* \* \* \*

 (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know its falsity, the lawyer shall take reasonable remedial measures.

The Comment to Rule 3.3, under the heading "False Evidence," states: "Upon ascertaining that material evidence (offered by the client) is

false, the lawyer should seek to persuade the client that the evidence should not be offered or, if it has been offered, that its false character should immediately be disclosed. If the persuasion is ineffective, the lawyer must take reasonable remedial measures."

**6.** Rule 1.16(b) in pertinent part provides:

 Except as stated in paragraph (c), a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, or if:

 (1) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent;

 (2) the client has used the lawyer's service to perpetrate a crime or fraud;

 (3) a client insists upon pursuing an objective that the lawyer considers repugnant or imprudent....

question the client about such matters, avoiding inquiries that would lead to perjury.

█ A number of courts have examined what an attorney must know before he determines if his client's testimony is perjurious. The Colorado Supreme Court, in *People v. Schultheis*, Colo.Supr., 638 P.2d 8, 11 (1981), stated:

A lawyer's belief that a witness intends to offer false testimony, however, must be based upon independent investigation of the evidence or upon distinct statements by the client or the witness which support that belief. A mere inconsistency in the client's story is insufficient ... to support the conclusion that a witness will offer false testimony.

In *United States ex rel. Wilcox v. Johnson*, 3rd Cir., 555 F.2d 115, 122 (1977), the Court opined that an attorney needs a "firm factual basis" for determining whether his client will perjure himself. The Eighth Circuit also requires attorneys to possess a firm factual basis before concluding that their client has committed perjury. *Whiteside v. Scurr*, 8th Cir., 744 F.2d 1323, 1328, *rehearing denied*, 750 F.2d 713 (1984), *rev'd sub nom. on other grounds, Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). In *Johnson v. United States*, D.C.Ct.App., 404 A.2d 162 (1979), the Court determined that defense counsel should evaluate the truth of a defendant's intended testimony "by comparing it to knowledge gained through consultation with the defendant and independent investigation of the case." *Id.* at 164. *See also Butler v. United States*, D.C.Ct.App., 414 A.2d 844, 850 (1980) (defense counsel needs to possess substantial facts indicating that his client is going to give perjured testimony). In *Commonwealth v. Alderman*, 292 Pa.Super. 263, 437 A.2d 36, 39 (1981), the court implicitly supported a "beyond a reasonable doubt" standard of knowledge when it determined that the defense attorney properly concluded that his client was going to commit perjury because there was "no reasonable doubt but that appellant's newly discovered alibi was a fabrication." *See also Commonwealth v. Wolfe*, 301 Pa.Super. 187, 447 A.2d 305, 310 n. 7 (1982) (attorney must know "for sure" that perjury is committed).[7] Adopting this prevailing law, we conclude that an attorney should have knowledge "beyond a reasonable doubt" before he can determine under Rule 3.3 that his client has committed or is going to commit perjury. This standard of knowledge is necessary to allow the attorney to represent the client zealously while remaining true to the judicial system.[8]

Recently the ABA has eschewed the use of the narrative, wherein the attorney allows his client to tell his version of the facts unaided by counsel's questioning. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. No. 87–353

---

7. A number of commentators also support a reasonable doubt standard. Kimball, *When Does a Lawyer "Know" Her Client Will Commit Perjury?*, 2 Geo.J.Legal Ethics, 579, 581 (1988) (Rule 3.3 should be interpreted to mean that a lawyer "is subject to sanction for using false evidence when she (1) subjectively has thought about the possibility of falsity, and (2) has no reasonable doubt that the proposed testimony would be false"). *See* Lefstein, *Client Perjury in Criminal Cases: Still in Search of an Answer*, 1 Geo.J.Legal Ethics, 521, 528 (1988) ("counsel should not judge the client's testimony as false unless there is absolutely no doubt about the matter"); *accord* Reiger, *Client Perjury: A Proposed Resolution of the Constitutional and Ethical Issues*, 70 Minn.L.Rev. 121, 149 (1985); Brasil, *Unanticipated Client Perjury and the Collision of Rules of Ethics, Evidence and Constitutional Law*, 44 Mo.L.Rev. 601, 608–09 (1979) ("at least beyond a reasonable doubt").

The Comments to the Model Rules also implicitly support a standard of reasonable doubt. Under Rule 3.3(c), a lawyer can refuse to offer evidence he "reasonably believes" is false. However, the Comment to the Rule recognizes that the constitutional right to counsel may require a higher standard of belief in criminal cases.

8. The reasonable doubt standard is not intended to allow attorneys to turn a blind eye to the facts. For instance, if an attorney's client said he had committed a crime and objective facts supported the story, the attorney would be subject to discipline for presenting evidence supporting an alibi defense. *See Board of Overseers of the Bar v. Dineen*, Me.Supr.Jud.Ct., 481 A.2d 499 (1984), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986).

(1987), slip op. at 8.[9] Nevertheless, the narrative continues to be a commonly accepted method of dealing with client perjury. *See* Lefstein, *Client Perjury in Criminal Cases: Still in Search of an Answer,* 1 Geo.J. Legal Ethics, 521, 523 (1988).

█ Counsel's resort to the narrative turns on the record facts as to whether counsel could have "known" or reasonably expected that Shockley was going to commit perjury. Shockley's counsel visited him at least four times in prison. Furthermore, an investigator from the Public Defender's office visited Shockley at least twenty times in prison. The Public Defender's office also obtained audio cassettes of the alleged confessions, autopsies of the victim, and FBI blood reports.

The record also indicates that at the time the Public Defender's office undertook to represent the defendant, Shockley had made conflicting statements to the police. In a taped statement, defendant told the police that he did not commit the crime. An officer who testified at the trial stated, however, that Shockley had told him orally that he may have committed the crime, but if he did, he could not remember doing it. Notwithstanding contrary statements to the police, Shockley concedes that at his second meeting with counsel on November 3, 1984, he admitted killing his wife.

In addition to these facts, there were two medical examinations which were not admitted at trial.[10] In one examination, the defendant admitted that he had killed his wife. In the second, he cryptically denied killing his wife. The second examining doctor concluded that he was lying about this fact.

On the third day of trial, Shockley's attorney approached the trial judge *ex parte* to inform him that he believed his client was going to commit perjury. Haller stated, "I do not have any problems in my mind, by a beyond a reasonable doubt standard, that it is false, because of the extensive background we have in this matter." Counsel based this statement on his investigation on the case, conversations he had had with Shockley in the past, letters he had written to Shockley, and Shockley's previous medical examinations. Counsel emphasized that Shockley had said that "he wants to testify, and he wants to testify to a version of events which I know not to be true and Mr. Hudson knows not to be true." We find this record sufficient to sustain defense counsel's belief "beyond a reasonable doubt" that Shockley's testimony concerning his wife's death would be perjurious.

### B.

We turn to defendant's remaining principal argument that counsel's failure to deliver both an opening and a closing statement amounted to a complete denial of his right to counsel. On the record before us, we conclude that counsel's decision, though highly unorthodox, was reasonable in the light of defendant's inconsistent and changing position about representation, and therefore not so deficient as to be constitutionally defective. *See United States v. Nersesian,* 2d Cir., 824 F.2d 1294 (1987) (waiver of opening statement allowing counsel to not commit itself to a particular

---

9. In adopting the Model Rules, the ABA desired to place a greater emphasis on a lawyer's duties as an officer of the court than the organizations' Code of Professional Responsibility had. Gaetke, *Lawyers as Officers of the Court,* 42 Vand.L.Rev. 39, 61 (1989). The first line of the Preamble to Delaware's Lawyers' Rules of Professional Conduct highlights this point by placing a lawyer's duties as an "officer of the legal system" on an equal footing with his responsibilities as a "representative of clients."

10. Early in his investigation, the public defender believed that it would be reasonable to pursue an investigation of the mental state of the defendant. At some point between the time of these examinations and the time of the trial, defense counsel gave the two reports to the prosecution. The prosecution never made a formal request to the court for the report. Indeed, there was no expert testimony at the trial about the state of mind of the defendant. Defendant later stated in the postconviction hearing that because his attorney gave these reports without his permission to the prosecution, he lost all confidence in his attorneys and could no longer trust them. As a result, Shockley sought new counsel. For our rulings concerning various claims Shockley makes about these reports, *see infra* section IV.

position reasonable under the circumstances); and *Nutall v. Greer*, 7th Cir., 764 F.2d 462 (1985) (failure to make a closing statement is not ineffective assistance per se).

By August 1985, the relationship between Haller, who was coordinating the trial, and Shockley had deteriorated significantly. On August 26, 1985, in a conference before the trial judge, Shockley stated that he did not want Haller to continue to represent him. Indeed, Shockley no longer wanted to be associated with anyone from the Public Defender's office.[11] He felt that Haller had betrayed him by releasing two psychiatric examinations to the prosecution. Initially, Shockley said he would represent himself at trial;[12] later he agreed to the judge's appointment of another member of the Public Defender's office, Howard Hudson, Jr., as lead counsel. Hudson had previously been co-counsel with Haller on Shockley's trial.

Despite the fact that Shockley agreed to be represented by Hudson, he continued to refuse to cooperate with the public defender. On September 5, Shockley wrote to Hudson and to the court, stating that he did not believe that Hudson could fairly represent him because of the "serious conflict" between Haller and himself. Also at this time, Shockley refused to speak to the investigator from the Public Defender's office who had come to the prison to see Shockley. On September 13, the court responded to Shockley's letter, treating it as a *pro se* application for appointment of counsel other than the Public Defender. The court found that Shockley's "broad, general and unsupported objections to Haller provide[d] no basis for charging Hudson with a conflict of interest" and for appointing substitute counsel. In a letter dated September 16, 1985, Shockley asked the court to reconsider its denial of his request for appointment of a new attorney. Haller, by letter dated September 18, also requested that the court reconsider appointment of other counsel. The court again determined that appointment of other counsel was not necessary.[13]

The consequence of these disagreements between counsel and Shockley was that on the day the trial began, Shockley represented himself, with Hudson as stand-by counsel. Shockley briefly addressed the jury, telling them that he could not and would not represent himself and that, due to a conflict, Mr. Hudson could not represent him and therefore he would "plead the fifth" until he received adequate representation. The State called its witnesses to the stand. Shockley made no objection to the State's questions. After the lunch recess on the first day, Hudson, Haller, and the trial judge were able to persuade Shockley to allow Haller to represent him because of Haller's familiarity with the case. Haller then called a number of State witnesses back to the stand and cross-examined them.

After the State had concluded its case-in-chief, the court gave Haller the opportunity to make an opening statement. Haller declined to make an opening statement. At Shockley's postconviction hearing, Haller stated that he could not give an opening statement because he was unsure where the defense would go. Based on the information counsel had previously uncovered, Haller and Hudson wanted to pursue an emotional distress defense. Shockley, how-

---

11. Sometime in June or July of 1985, Shockley had retained a private attorney. Shockley was reportedly uncooperative with this attorney and eventually the attorney quit.

12. The transcript of the August 26, 1985 conference does not indicate whether the court discussed with the defendant the dangers of self-representation. Nevertheless, the record reveals that the defendant was fully aware of the limitations of self-representation and on several occasions articulated this concern to the court.

13. In making its ruling, the court first noted that Shockley made no particular allegations of ineffective assistance of counsel. The defendant had argued that his Public Defenders were not calling or subpoenaing the witnesses that the defendant had requested. The defendant, however, never supplied the Public Defender with a list of witnesses. The court also stated that "mere incompatibility or a difference of opinion between the defendant and his public defender as to trial strategy is not a ground for finding ineffective representation." Accordingly, the court determined that it would not appoint other counsel to represent Shockley.

ever, was by then claiming unequivocally that he did not commit the crime.

On the final day of trial, after the State had given its closing argument, Shockley's attorneys decided not to deliver a closing argument. They believed that they could not give a convincing closing argument based on their belief that Shockley's testimony was perjurious. While they later conceded that there were certain points they could have raised, e.g., that the jury needed to find Shockley's guilt beyond a reasonable doubt, they had concluded that the benefits of such an argument were outweighed by the strategic benefit of depriving the State of a rebuttal.

■ On these facts, we conclude that counsel's decision not to give either an opening or a closing statement did not deprive defendant of the right to counsel. Defense counsel's failure to make an opening statement must be viewed in light of Shockley's lack of cooperation with counsel. Defense counsel's waiver of closing argument appears to have been a considered tactical choice. *See Donegan v. McWherter*, M.D.Tenn., 676 F.Supp. 154 (1987); *State v. Menn*, Tenn.Ct.Cr.App., 668 S.W.2d 671 (1984) (failure to make a closing argument a legitimate trial tactic to deprive State of final argument). Counsel was also mindful of the ethical prohibition against presenting to a jury what he believed, beyond a reasonable doubt, to be false statements. However, even if counsel's failure to make even a perfunctory closing statement arguably constituted ineffective assistance of counsel, we are satisfied, on the record before us, that prejudice cannot be found because the jury verdict would have been the same. *Strickland.*

### III

Shockley's third and fourth contentions are related. He first challenges counsel's decision to question his mother about his state of mind. Shockley maintains that introducing evidence of emotional distress conflicted with his own alibi testimony. He further argues that counsel's failure to procure a jury instruction on an emotional distress defense was ineffective assistance of counsel.

Before calling Shockley to the stand in the trial, the defense had called Margaret Taylor, Shockley's mother. Defense counsel attempted to elicit statements from Taylor demonstrating Shockley's disturbed emotional state. At side bar, defense counsel said that he had earlier explored an emotional distress defense and wanted to probe that area because he was uncertain as to how Shockley would testify when he got on the stand. Taylor testified that on the morning of August 27, the day before the killing, Shockley had taken a number of pills and then passed out on the floor. She further testified that when she returned home on Sunday night at 11:00, Donna called her into her bedroom and showed her that Shockley had torn her clothes and also that he had cut his own arm quite badly. On cross-examination, she testified to numerous arguments between Donna and Shockley.

Once again, in order to succeed on this aspect of his postconviction motion, Shockley must demonstrate that counsel's actions (i) were not objectively reasonable professional decisions; and (ii) altered the result of the proceeding. *See Albury*, 551 A.2d at 58; *Strickland*, 466 U.S. at 688 and 694, 104 S.Ct. at 2065, 2068.

■ The Superior Court determined that counsel's questioning of Taylor was reasonable under the circumstances because before Shockley testified the defense had not yet firmly resolved whether to pursue an emotional distress defense. We find this conclusion to be logical and supported by the record. Furthermore, Shockley specifically instructed his counsel to ask some of the questions about which he now complains.

■ The Superior Court further concluded that counsel's failure to procure an extreme emotional distress instruction was not defective because such an instruction

was barred by Shockley's own testimony. Where a defendant pursues the defense of extreme emotional distress, he admits performing the underlying criminal actions. *See Davis v. State*, Del.Supr., 522 A.2d 342, 343 (1987); *Ross v. State*, Del.Supr., 482 A.2d 727, 736 (1984), *cert. denied* 469 U.S. 1194, 105 S.Ct. 973, 83 L.Ed.2d 976 (1985). Shockley, however, testified that he did not kill his wife. Moreover, although Shockley was evaluated by two therapists, no psychiatric reports were submitted into evidence. Without credible evidence to support the extreme emotional distress defense, Shockley was not entitled to the instruction. *See Hamilton v. State*, Del.Supr., 343 A.2d 594, 596 (1975).

### IV

 Much of the conflict between Shockley and his court-appointed attorneys was a result of his lead attorney's decision to surrender to the prosecution two psychiatric evaluation reports. In preparation for trial, on the theory that he would pursue an emotional distress defense, defendant submitted to two psychiatric examinations. *See, supra*, n. 10. Counsel later revealed these reports to the State's attorney, believing that he would need to do so in any case when he pursued the defense at trial. *See, e.g., Re v. State*, Del.Supr., 540 A.2d 423, 428–29 (1988). When the emotional distress defense was aborted, the reports were not submitted into evidence and never became a part of the trial record. While conceding this to be true, Shockley claims that the release of the reports caused a complete breakdown of trust between him and his counsel and amounts to ineffective assistance of counsel. Although we understand Shockley's concern over the release of these reports, Shockley suffered no prejudice as a result. *Compare Bradley and Brittingham v. State*, Del.Supr., 559 A.2d 1234, 1239 (1989) (no prejudice where prosecutor in good faith obtained results of defendant's polygraph test which were never admitted into evidence).

### V

 During the period when Shockley was not speaking with his counsel, he took a blood test pursuant to a Family Court order in July 1985. Shockley argued in his postconviction hearing that he was never given any advice as to whether he should take the blood test or not. He argues that this failure to give advice amounts to ineffective assistance and that he suffered prejudice as a result. The purpose of the blood test was to determine the paternity of his wife's younger sister's child. Language on the order permitting his transfer to take the test stated that the "blood test relates to issue of paternity, which relates to issue of emotional distress and pending homicide prosecution." At trial, the blood test was used to show a motive for Shockley's argument with his wife on the day of the murder—the test showed a 99.19% probability of paternity.

At the time Shockley submitted to the blood test, he was—by choice—not communicating with the public defender's office. Moreover, the record reveals that he had retained private counsel. Accordingly, we conclude that counsel was not ineffective in failing to advise Shockley about the blood test.

### VI

 During the trial, the State called to the stand Shockley's former employer. The employer stated that at some point after the killing, Shockley had, from prison, phoned him at his home. The former employer testified that, in this phone conversation, Shockley admitted killing his wife. Defense counsel objected to the State's questioning of the witness on the ground that the State had not laid a proper foundation for introducing the witness's statement. The objection was sustained following which the State laid the proper foundation.

On cross-examination, defense counsel elicited the fact that the witness could not affirmatively identify Shockley as the person on the phone because Shockley had not

identified himself. The witness stated only that he recognized Shockley's voice.

Defendant now argues that counsel should not only have objected to the testimony, but should have requested voir dire and moved to strike for lack of authentication. *See* D.R.E. 901(b)(5).[14] We find no merit in this contention. On direct, the witness testified that he knew Shockley's voice due to their friendship and because they had worked together for several years. Counsel did what a reasonable professional would have done in this situation. The transcript also indicates that defense counsel effectively cross-examined the witness.

### VII

We find defendant's remaining claims of ineffective assistance of counsel (numbers 8–11) to be without merit or to raise issues of clearly settled law. As to those issues, we affirm on the basis of the opinion below.

In summary, to the extent that Shockley's representation was deficient, we do not find that the outcome of Shockley's trial was prejudiced either as a result of collective errors or isolated error. We find in the record conclusive evidence supporting the jury's finding of guilt.

\*　　\*　　\*

Affirmed.

---

**14.** Delaware Rule of Evidence 901(b)(5) provides:

 **(5) Voice Identification.** Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.