437 A.2d 36

**COMMONWEALTH of Pennsylvania**

v.

**James ALDERMAN, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 5, 1980.

Filed Nov. 13, 1981.

Brosky, J., concurred in the result.

William P. James, Philadelphia, for appellant.

Michele A. Goldfarb, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, BROSKY and HOFFMAN, JJ.

SPAETH, Judge:

This is an appeal from judgments of sentence for burglary, possessing an instrument of crime, simple assault, and conspiracy. Appellant, who obtained new counsel after trial, argues that he should have a new trial because his trial counsel was ineffective. Finding no merit to this argument, we affirm.

■ In reviewing a claim of ineffectiveness, we must make an independent review of the record, and of trial counsel's "stewardship of the now challenged proceedings in light of the available alternatives." *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604, 235 A.2d 349, 352 (1967). Here, our review of the record reveals the following.

On November 18, 1978, a group of ten to fifteen people were at the house of Alice Price, in Philadelphia, for a dinner that she was sponsoring to raise money for her church choir. At about 5:00 p. m. three men entered the house, announced a holdup, and ordered everyone to lie down on the floor. One man held a shotgun on the victims; another collected their jewelry and pocketbooks; and a third went upstairs in search of other persons. This third man was later identified by Alice Price and her nephew, Leon Stewart, as having been appellant. Leon Stewart was in a bedroom on the second floor. When he saw appellant climbing the stairs with a gun, he closed and locked the bedroom door. Appellant fired his gun into the door; the bullet went through the door and struck Stewart in the arm. Appellant then kicked in the door. Stewart fired a 12 gauge shotgun at appellant and wounded him in the neck. After emptying his gun at Stewart, wounding him in the arm, neck, and shoulders, appellant retreated down the stairs, bleeding profusely, and fled, with his cohorts.

Appellant was taken to Einstein Hospital and placed in intensive care, and a little later, so was Stewart. The police interviewed Stewart, and on the basis of what he told them had happened, and his description of the man he had shot, they arrested appellant.

Appellant testified in his own behalf. He denied having been at the Price residence, and denied involvement in the robbery. He explained his wounds as follows:

My father had some shotguns in the cellar. I was messing around with one of the shotguns. I went there, had been looking around the house was in the cellar, was messing with one of the shotguns, which went off, hit me in my face. All I could think of was trying to get to a hospital, so as I ran upstairs, I couldn't think of going to the phone, to call an ambulance. I opened the door to see if my mother's neighbor, who is a close friend of the family's, she was home, she had an automobile. At that time my cousin Joseph Newkirk drove up, asked what happened, I told him a shotgun went off. He said, "Come on, let's get you to a hospital." I got in the car, he took me to a hospital at Broad and Olney.

N.T. 164.

In his summation,[1] appellant's trial counsel referred to this testimony. He said: "My theory is this: robbery occurred. Mr. Stewart was shot. Mr. Alderman had been shot at his mother's house." N.T. 182. Counsel then proceeded to attack the Commonwealth's identification evidence and emphasized appellant's testimony regarding the origin of his wounds. N.T. 182–193.

An evidentiary hearing on counsel's effectiveness was held, at which Newkirk, appellant's brother Robert, appellant, and trial counsel testified.

Newkirk testified that on November 18, 1978, he went to the house of his aunt, appellant's mother, and upon arriving, saw appellant standing at the door, holding his collar. He also testified that when appellant said that he had accidentally shot himself, he took appellant to the emergency ward of Einstein Hospital. N.T. 2/13/80 at 2–5.

Appellant's brother Robert testified that in November 1978 he lived with his mother, and that on November 18, after learning of appellant's injury, he went to the basement

---

1. Trial counsel did not make an opening statement.

and on the floor found a shotgun with one chamber empty and one chamber loaded, and blood. N.T. 2/13/80, 5–8.

Appellant testified that he first conferred with trial counsel "right before trial." He said that counsel never interviewed his cousin Newkirk or his brother Robert. N.T. 2/13/80, 11. Also, he said, counsel did not go to his mother's house to see if any guns were there. *Id.* at 13. He further testified:

> I did ask [trial counsel] before trial about my witnesses. I was under the impression that we were going to get a postponement, because I never had a chance to talk to [trial counsel], really, but the Public Defenders [who earlier represented appellant] did have the names of the witnesses that I wanted to call to trial, so when [trial counsel] took the case over, like I said, I would talk to him right before trial, and I explained to him I wanted to call the witnesses and he said that most likely we could get a postponement, because he really did not have a chance to prepare a defense or case. See?
>
> *Id.* at 12.

Trial counsel testified that he was retained two months before trial and during that period spoke with appellant on two occasions in a cellroom and on two or three occasions by telephone. N.T. 2/14/81, 19, 20, 21. Counsel testified that before trial appellant told him that "he had gone to the place in question. There was some kind of debt owed by the man who shot him. It was a kind of self-defense kind of thing." *Id.* at 27. Also, counsel testified, appellant's mother had told him that appellant had been involved in the crime and had gone to the Price house to collect a debt owed him in a drug deal. *Id.* at 20–21. Counsel testified that the first time he learned of appellant's story—that he had accidentally shot himself—was "during the course of trial when the trial was going on and we had, you know, a day or so in between, you know; when we were—at the end of the day." *Id.* at 21. Counsel testified that he did interview appellant's brother Robert, "who was in the courtroom at the time." *Id.* at 22. "I asked him about the cousin [Newkirk]. He

said he didn't want to get the cousin involved." *Id.* at 27. Counsel was not asked whether, and did not testify that, appellant's brother Robert had said anything about finding a shotgun and blood in his mother's basement. Counsel explained his failure to call Newkirk and appellant's brother as witnesses as follows:

Your Honor, basically from what I was told by Mr. Alderman and Mr. Alderman's mother, the defense that was presented actually in the courtroom was not what the mother believed had happened and not what Mr. Alderman had told me initially had happened. And you run into really an ethical problem there as to whether you are presenting the truth to the Court.

Id. at 26–27.

The lower court accepted trial counsel's testimony and rejected the testimony of appellant and his witnesses. Thus, in dismissing appellant's claim of ineffective assistance of counsel, the court stated that had "[counsel] presented alibi witnesses and physical evidence tending to show that [appellant] was shot at another place," he would have "introduced . . . perjured testimony." Slip op. at 2.

It is a general principle that

[o]ur legal system does not constitute the lawyer the judge as to the justice or the soundness of the causes committed to him, but deems it in the ends of justice to have all the facts and arguments on each side of the controversy presented by expert counsel, stimulated to a maximum of industry and ingenuity by the contest, for decision by court and jury.

Drinker, Legal Ethics (Greenwood Press 1980) at 142. In conformity with this principle, our Supreme Court has held that when counsel is advised of an alibi defense, he should ask his client the names and addresses of the alibi witnesses and interview them, and that his failure to do so may render him ineffective. *Commonwealth v. Bronson*, 457 Pa. 66, 321 A.2d 645 (1974).

It does not follow, however, that appellant's counsel's failure to interview Newkirk rendered him ineffective. For

It is axiomatic that the right of a client to effective counsel in any case (criminal or civil) does not include the right to compel counsel to knowingly assist or participate in the commission of perjury or the creation or presentation of false evidence.

A.B.A. Committee on Ethics & Professional Responsibility, Informal Opinion 1314, 3/25/75.

*See also,* DR 7–102(A)(4), (6), (7).

Counsel's testimony at the post-conviction hearing makes plain that counsel believed that to call Newkirk (and appellant's brother, assuming that the brother had told counsel about finding the gun and blood) to testify as alibi witnesses would be "to knowingly assist or participate in the commission of perjury or the creation or presentation of false evidence." The question we must decide, therefore, is whether counsel was entitled to his belief, even though he had not interviewed Newkirk or gone to appellant's mother's house to see if there were any guns there.

We are satisfied that counsel was entitled to his belief. No doubt sometimes a defendant may risk conviction rather than reveal exculpatory evidence to his lawyer. He may, for example, wish to shield someone. Also, no doubt a defendant may say one thing to his lawyer and later contradict it, when for one reason or another—new information, for example—his memory has been refreshed and he concludes that his first account was mistaken. Every change in a defendant's story should not be viewed by counsel as a fabrication. Here, however, there could have been no reasonable doubt but that appellant's newly discovered alibi was a fabrication. The change in appellant's story could not be explained as an error of memory, and nothing suggested that appellant was trying to shield someone—nor does appellant now offer either of these explanations.

Since appellant had no right to have counsel offer false evidence, counsel's failure—more accurately, his refusal—to interview Newkirk and to go to appellant's mother's house to see if there were any guns there cannot be the basis of a finding that counsel was ineffective.

This conclusion, however, does not end our concern with counsel's actions. While we recognize the dilemma that confronted counsel, we cannot condone his method of resolving it.

Disciplinary Rule 7–102(B)(1) of the Code of Professional Responsibility, adopted by our Supreme Court effective February 27, 1974, provides that when a lawyer "receives information clearly establishing" that his client has perpetrated a fraud upon a court—as occurred here, when appellant gave his perjured testimony—the lawyer

> shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal except when the information is protected as a privileged communication.

D.R. 7–102(B)(1).

The last clause—regarding a "privileged communication"—has provoked intense debate, especially as regards the duty of a lawyer representing one accused of crime. We need not summarize the differing points of view now; for an excellent summary, see Wolfram, Client Perjury: The Kutak Commission and the Association of Trial Lawyers on Lawyers, Lying Clients, and the Adversary System, American Bar Foundation Research Journal No. 4 at 964–80 (1980). It is enough if we state the issue generally. On the one hand, it is argued that the constitutional right to the effective assistance of counsel requires that the accused know that no matter what he tells counsel, counsel will not disclose it. On the other hand, it is argued that the integrity of the adversary system, as well as of counsel personally, requires that counsel not become a knowing participant in fraud.

Several resolutions of this issue have been suggested and are currently being debated incident to review of the American Bar Association's proposed Model Rules of Professional Conduct. We may mention two. One solution would entirely excuse the lawyer from any duty to reveal perjury if the perjury were that of the client's; the lawyer would be permitted to argue known perjury to the fact-finder as

credible. Another solution would require the lawyer to try to persuade the client "to rectify" the perjury; if the client refuses and no other reasonable measures are available, the lawyer may have to disclose the perjury. *See* Kutak, Model Rules of Professional Conduct: Ethical Standards for the '80s and Beyond, 67 A.B.A.J. 1116, 1119–20 (1981).

 Here, although refusing to interview Newkirk, as regards appellant's testimony trial counsel resolved his dilemma by adopting the first of these two solutions: he treated testimony he reasonably believed to be perjured as though it were true, eliciting the testimony by his questions, and arguing it to the jury as credible. This conduct was unjustified.

All of the extant cases and, with one exception, all commentators, until the publication of the Freedman—ALTA draft [2] have agreed that a lawyer would be subject to professional discipline and possibly other legal sanctions for such conduct [arguing known perjury to the fact-finder as credible].

Wolfram, *supra* at 978 (footnotes omitted).

Disciplinary Rule 7–102 provides:

(A) In his representation of a client, a lawyer shall not:

. . . . .

(4) Knowingly use perjured testimony or false evidence.

(5) Knowingly make a false statement of law or fact.

(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

. . . . .

Whatever may be a lawyer's duty to make an affirmative disclosure of his client's perjury—and we need not decide

2. This reference is to a June 1980 draft authored by Monroe H. Freedman and said to reflect extensive comment by the members of the Association of Trial Lawyers of America Commission on Professional Responsibility but not finally approved by it. Wolfram, *supra* at 965 n. 10.

that issue now—it is clear that the lawyer may not argue known perjury to the factfinder as credible.

This conclusion requires us to ask: Would effective counsel have acted as trial counsel here did? Does not effective counsel always—that is, by definition—conduct himself in accordance with the Disciplinary Rules? We believe that effective counsel does always conduct himself in accordance with the Disciplinary Rules. This belief, however, does not persuade us to award appellant a new trial. To do that would be a most curious result. It was appellant's perjury that led counsel to argue as he did. To say that since counsel should not have argued that way he was ineffective, *and therefore* appellant will be granted a new trial, would be to reward a perjurer for his perjury.

 Appellant's remaining arguments may be dismissed summarily. The arresting officer was permitted over appellant's counsel's objection to say that clothing he had taken from appellant "appear[ed] to have . . . wood chips" on it. N.T. 152. Appellant argues that the court should have sustained counsel's objection, and that counsel was ineffective for failing to move for a mistrial. However, counsel had no reason to suppose that such a motion would be granted. Even assuming that the testimony was impermissible opinion, rather than mere shorthand, the jury was not confused. On cross-examination the officer admitted that when he submitted the "wood chips" for analysis, the laboratory reported that "they could not do an analysis." N.T. 158. Appellant also argues that counsel was ineffective for failing to request the court to instruct the jury to receive the identification testimony with caution. While the court did not use the words "with caution," its charge adequately covered the factors the jury should consider. Finally, appellant argues that counsel was ineffective for failing to request the court to instruct the jury concerning alibi testimony. Such a request would further have implicated counsel in appellant's perjury.

Affirmed.

BROSKY, J., concurs in the result.