**In re Anonymous No. 140 D.B 89**

Disciplinary Board Docket no. 140 D.B. 1989.

Before the Disciplinary Board of the Supreme Court of Pennsylvania:

KERNS, *Member,* May 13, 1993—

## I. HISTORY OF THE PROCEEDINGS

On December 18, 1989, a petition for discipline was filed with the Disciplinary Board of the Supreme Court

of Pennsylvania alleging that respondent engaged in professional misconduct as a result of his representation of [A] in 1985 and 1986. Respondent was charged with three violations: first, that he assisted his client in perpetration of a fraud by using false evidence to support his case; second, that he failed to call upon his client to rectify the fraud or to inform opposing counsel and the court upon his client's refusal to rectify said fraud; and third, that he failed to withdraw from representation after the fraud became evident.

Respondent filed an answer to the petition for discipline on January 19, 1990, denying the allegations of wrongdoing. On September 19, 1990, Hearing Committee [     ] held a hearing on the petition. Both parties submitted briefs in support of their respective positions.

On March 1, 1991, the Hearing Committee chairperson notified the Office of the Secretary of the Disciplinary Board that the evidence established a violation of the rules and requested scheduling of the penalty hearing pursuant to Disciplinary Board Rule §89.151. After receiving evidence with regard to the penalty to be imposed, on May 13, 1992, the committee recommended the imposition of a one-year-and-one-day suspension, stayed pending the successful completion of a concurrent probation in which respondent would be required to develop certain office procedures to ensure his future compliance with the Rules of Professional Conduct. Respondent timely filed a brief on exceptions specifically objecting to the recommendation of finding of violations of D.R. 7-102(B)(1), D.R. 2-110(B)(2), and D.R. 1-102(A)(6), and the recommendation of discipline. The Office of Disciplinary Counsel timely filed a brief in support of the committee report and recommendations.

## II. FINDINGS OF FACT

We make the following findings of fact based on the detailed testimony before Hearing Committee [    ].

(1) Respondent was born in 1929 and was admitted to the practice of law in the Commonwealth of Pennsylvania on or about June 2, 1958. At the time of the hearing on this matter, his office was located [    ]. His office is now located at [    ].

(2) Pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, petitioner brought allegations of conduct in violation of the Pennsylvania Code of Professional Responsibility against respondent. (204 Pa. Code, Ch. 81.)

(3) On October 31, 1983, respondent entered his appearance on behalf of the plaintiffs in the case captioned *[A] and [B] v. [C] Co. and [D] Co. and the [E] Fund,* [    ] Court of Common Pleas, February term, 1983, no. [] ([C] case).

(4) On October 13, 1983, the deposition of [A] was taken by his attorney of record at that time, [F]. Respondent was not present at that deposition.

(5) On January 17, 1984, respondent entered his appearance on behalf of the plaintiffs in the case captioned *[A] and [B] v. City of [    ],* [    ] Court of Common Pleas, February term, 1983, no. [    ] (City case).

(6) At the time respondent entered his appearance in the [C] case, Attorney [F] had already filed a complaint and four amended complaints. The fourth amended complaint included a claim for loss of rental revenue pursuant to a 10-year lease entered into between plaintiffs and a third party.

(7) Respondent filed another amended complaint in the case which included the claim for loss of rental revenue pursuant to the 10-year lease.

(8) On February 7, 1984, respondent represented [A] and was present for the deposition of [G] for purposes of the [C] case, in which [G] testified that:

(a) He was the owner of [H] Company on whose behalf he had negotiated the lease in question with [A], and

(b) Prior to entering into the lease with [A] in early July, he had only been casually acquainted with him.

(9) On January 24, 1985, nearly one year after taking [G's] deposition in the [C] case, respondent, representing [A] in the City case, was present for [A's] deposition, where [A] testified that:

(a) He had been employed by [H] as a working foreman, and

(b) His sole supervisor had been the owner of [H], [G].

(10) On March 5, 1985, respondent, representing [A] in the City case, was present for the deposition of [G] in which [G] testified that:

(a) He was the owner of [H] and

(b) He had employed [A] as one of two foremen working for him.

(11) [A's] deposition testimony of January 24, 1985, in the City case was consistent with [G's] deposition of March 5, 1985, in the City case.

(12) [G's] deposition testimony of February 7, 1984, in the [C] case, 13 months earlier than his deposition testimony of March 5, 1985, in the City case, was inconsistent with his testimony of March 5, 1985, and was inconsistent with [A's] testimony of January 24, 1985, in the City case.

(13) On May 2, 1985, respondent represented [A] at trial in the City case, where [A] testified consistently with his deposition testimony and respondent read into the record [G's] deposition testimony of March 5, 1985.

(14) Respondent did not become aware that [G], President of [H], lessee under the lease, was the employer of [A], lessor, until [G's] deposition in the City case on March 5, 1985.

(15) At that time, respondent's recollection of the specifics of [G's] February 7, 1984, deposition testimony had dimmed.

(16) [I], Esq., attorney for [C] Insurance Company, never indicated to respondent that he considered the lease to be fraudulent or invalid, and indicated that his client would have considered a settlement of the lost rental claim for the maximum recovery under the policy, namely $9,000.

(17) Respondent never perceived the testimony of [G] and [A] as fraudulent, thereby imposing upon him a duty to notify the tribunal and/or opposing counsel.

(18) Respondent attended a settlement conference with Judge [J], at which time he advised the judge that [G] and [A] were lessor and lessee and employer and employee.

(19) During the conference, Judge [J] informed respondent that the case was worth $19,000, which amount represented the claim for property damage only.

(20) Respondent recommended the settlement figure to [A], who rejected it.

(21) Respondent promptly withdrew from representation of [A].

## III. CONCLUSIONS OF LAW

Respondent's aforementioned conduct did not violate the following Disciplinary Rules:

(1) D.R. 7-102(B)(1)—failure to call upon a client to rectify fraud or to reveal the fraud to the tribunal and opposing party;

(2) D.R. 1-102(A)(6)—prohibiting an attorney from engaging in conduct that adversely reflects on his fitness to practice law; and

(3) D.R. 2-110(B)(2)—failure to withdraw from employment after learning that the employment would result in a violation of the Disciplinary Rules.

## IV. DISCUSSION

### A. *The Respondent Did Not Violate Disciplinary Rule 7-102(B)(1)*

Disciplinary Rule 7-102(B)(1) states that a lawyer who receives information clearly establishing that his client has, in the course of the representation, perpetrated a fraud upon a person or tribunal, shall promptly call upon his client to rectify the same, and if his client refuses, or is unable to do so, he shall reveal the fraud to the affected person or tribunal except when the information is protected as a privileged communication.

### 1. *Respondent's Client Did Not Perpetrate a Fraud*

Without finding that a fraud was perpetrated by [A] and/or [G], respondent cannot, by definition, be held to have violated D.R. 7-102(B)(1).[1] Nowhere does the Penn-

---

1. Fraud will not be presumed and must be affirmatively proved by the one who asserts it. *Shecter v. Shecter,* 366 Pa. 30, 76 A.2d 753 (1950) ("The general rule is that fraud will not be presumed, but must be affirmatively proved. Instead, the presumption is against fraud and in favor of innocence.") See also, *Colonna v. Morrissey,* 72 Pa. Super. 200 (1919); *Killeen's Estate,* 310 Pa. 182, 165 A. 34 (1933). Fraud must be established by direct proof, or by facts clearly proved, sufficient to warrant a presumption of its existence. *Davis v. Carbon County,* 369 Pa. 322, 85 A.2d 862 (1952); see also, *Pocono Spring Water Ice Co. v. American Ice Co.,* 214 Pa. 640,

sylvania Code of Professional Responsibility define fraud. However, the Annotated Model Rules of Professional Conduct require that the client's representations create a *material* misconception. Annotated Model Rules of Professional Conduct, Rule 3.3, at 343. Thus, petitioner must show that any misconception created by the deposition testimony at issue was material.

a. *It is immaterial whether the parties to the lease stood in an employment relationship.*

Petitioner has submitted no argument, as indeed it cannot, to suggest that, in and of itself, a lease agreement between an employer and his employee is not perfectly legal, valid and enforceable. A lease agreement, or any type of contract, between an employee and employer can be an "arms-length" transaction. An arms-length transaction, by definition, is one wherein the parties thereto negotiate on equal footing or terms, neither party exercising control or undue influence on the other. An employment relationship does not preclude a lease negotiated between the employer and employee from being an "arms-length" transaction. Indeed, "arms-length" transactions can be entered into by business partners, corporate parents and their subsidiaries, employers and independent contractors, between family members and between friends. To find otherwise would require all parties to leases or other agreements to be complete strangers, a finding that would turn the commercial world on its head. Petitioner does not allege either a fiduciary or a confidential relationship between [G] and [A], the only relationships in which the law presumes one party has undue influence over the other. See *Ruggieri v. West*

---

64 A. 398 (1906). It must be noted that the opportunity for fraud, suspicion and conjecture do not take the place of evidence of fraud. *Holden's Estate,* 387 Pa. 484, 128 A.2d 568 (1957).

*Forum Corp.,* 444 Pa. 175, 282 A.2d 304 (1971). Petitioner's evidence did not show this to be a case where "the parties do not deal on equal terms but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." *In re Estate of Mihm,* 345 Pa. Super. 1, 497 A.2d 612 (1985), citing *Leedom v. Palmer,* 274 Pa. 22, 117 A. 410 (1922). Furthermore, even an agreement consummated by negotiations that were not "arms-length" does not, ipso facto, render the agreement fraudulent.

Thus, any employment relationship, in and of itself, was immaterial to the validity of the lease. Petitioner has neither pleaded nor attempted to establish a collusive arrangement between [G] and [A]. Such an arrangement goes to the very essence of the alleged fraud. For this reason alone petitioner's case must fail. Even if [G] and [A] stood in an employment relationship, this by no means proves by clear and satisfactory proof that a collusive arrangement existed between them that resulted in a fraudulent lease.

b. *The deposition testimony of [G] and [A] was merely inconsistent.*

Petitioner has alleged that the deposition testimony of [A] and [G] in the [C] case was inconsistent with their respective deposition testimony in the City case, and that those inconsistencies constituted fraud.

The deposition statements in and of themselves were not fraudulent. The existence of any employment relationship was a relatively unimportant disclosure that had not been revealed at the time of the [C] depositions, but in no way affected the validity of the lease. Respondent viewed the disclosure merely as additional information that had bearing on the City case and little bearing on the [C] case. At best, the deposition statements

were inconsistent, and by no means is it the law that inconsistent statements by themselves are fraudulent.

## 2. *Respondent Did Not Receive Information, and Thus Had No Knowledge of Any Alleged Fraud*

### a. *The deposition statements of [G] and [A] did not "clearly establish" a fraud.*

Assuming that a fraud, in fact, took place, petitioner must prove that respondent received information clearly establishing the fraud, and thus had knowledge of it. In *Commonwealth v. Alderman*, 292 Pa. Super. 263, 269, 437 A.2d 36, 39 (1981), a case directly examining the application of D.R. 7-102(B)(1), the court stated that, "Every change in a defendant's story should not be viewed by counsel as a fabrication." Thus, the Superior Court allows a lawyer to ignore certain modifications and to consider such inconsistencies as normal and regular. Here, respondent viewed deposition statements about an employment relationship between [A] and [G] as just such an inconsistency. He had no reason to believe that the deposition statements might have been perjured and no reason to doubt the validity of the lease.

No Pennsylvania case clearly defines the level of certainty required by the phrase "clearly establishing" in D.R. 7-102(B). One commentator, however, has noted that the level of certainty is, indeed, high:

"Several factors suggest, however, that information that leaves counsel with any significant doubt cannot be considered to 'clearly establish' the wrongdoing of the client. Ethical Consideration 7-3 explicitly directs 'a lawyer [, while serving as an advocate, to] resolve in favor of his client doubts as to the bounds of the law.'... [I]t seems fair to assume that counsel should not reach a conclusion that would force him to turn against his client and disclose

alleged misconduct unless he is convinced at least beyond a reasonable doubt that the client has committed fraud or perjury." Wayne D. Brazil, *Unanticipated Client Perjury and the Collision of Rules of Ethics, Evidence and Constitutional Law,* 44 Mo. L. Rev. 601, 608-09 (Fall 1979). The deposition statements of [A] and [G] do not establish beyond a reasonable doubt that the lease was fraudulent or that their testimony was perjured.

In all, there were four depositions, [G] and [A] each testifying in each case. Respondent never attended the first deposition, that of [A] in the [C] case. He never read the transcript nor did he have knowledge of the testimony given at that deposition. The first deposition respondent attended was that of [G] on February 7, 1984, where [G] testified that he had negotiated the lease with [A], that prior thereto they were only casually associated and that subsequent thereto they saw each other only to discuss the lease. It would have been difficult for any attorney to recall specifically [G's] testimony as to his relationship with [A].

The second deposition was that of [A] in the City case and took place on January 24, 1985. [A] testified that he was employed by [H] as a working foreman. Having attended only the deposition of [G] in the [C] case one year earlier, respondent was not aware that the employer [A] was referring to was the lessee on the lease in the [C] case.

[G's] second deposition took place on March 5, 1985, 13 months after he was first deposed, along with several others, in the [C] case. Thirteen months had passed between the depositions, all in the practice of an active attorney.

Respondent became aware of the assertion of an employment relationship between [G] and [A] at this second deposition of [G] on March 5, 1985. To say that at

this point respondent became aware of a fraud defies logic.

(1) Due to the relative unimportance of the lease in the [C] case respondent paid little attention to the employment statements.

(2) That [G] and [A] engaged in an employment relationship does not, of itself, indicate that the lease was fraudulent.[2]

(3) Respondent viewed the employment relationship as a fact immaterial and unimportant to the [C] case.

Thus, respondent was not alerted to any fraud by second deposition testimony and throughout the case, had no knowledge that any fraud existed, if it did at all.

b. *Neither [C] nor [C's] counsel, [I], Esq., ever expressed a belief that the lease was fraudulent.*

Neither [C] nor [I] ever directly expressed doubt to respondent as to the validity of the lease. [C] certainly considered its exposure on the claim for loss of economic benefit up to the policy limit of $9,000. "We aren't going to pay any money on the loss of rents claim, *unless we went to $9,000.* We didn't believe in the lease." The denial in defendant's answer was a garden variety response to an allegation in the plaintiff's complaint and raised no warning or notice of a "fraudulent lease." As [I] stated:

"Our position was we denied, in our answer to the complaint, the validity of that claim, *as we denied other averments....*"

[I] himself never communicated to respondent a belief that the lease was fraudulent. Although he may have been concerned with the timing of the execution of the lease, the dilapidated physical condition of the leased

---

2. As respondent later discovered, [G] was not, in fact, the employer of [A].

premises and authenticity of [G's] signature on the lease, none of these concerns were investigated. The defense was aware of the fact that a third-party realtor was involved, but they never deposed that realtor to shed light on the circumstances of the execution of the lease.

Furthermore, none of these "suspicions" were verbalized to respondent with particularity, if at all. [I], in denying the lease-related claims, may generally have expressed negative feelings about the lease. Such general concerns were expected to be expressed by [I], as the advocate for the defense. They triggered no special warnings in the mind of respondent.

There were no discussions between [I] and respondent specifically concerning the validity of the lease. As respondent testified:

"Nobody told me that the lease was fraudulent or suspected fraud. If the lease was discussed, it was the minor discussion, if anything."

Apparently, there were many "suspicions" in the mind of the defense, as would be expected at that point of the proceedings, but [I] never communicated to respondent a belief that the lease was fraudulent.

*"I don't specifically recall such a discussion* but we talked about the lease and I know we talked about various parts of the lawsuit and what our various positions were about the lawsuit."

"[Respondent] knew and I knew that the loss of rents claim had to go away because it was a major bone of contention. But the punitive damages had to, it was never going to be a part of the settlement."

Q: "Wasn't that information communicated to [respondent]?"

A: "... again, do I have a specific recollection of the words used? I don't."

"I can't recall ever saying anything like, '[Respondent], that's a fraudulent claim' ... so I'm sure I didn't ... I know I told him that we were taking [G's] deposition because we had some serious questions about the lease. I'm sure I didn't say, 'Hey, [Respondent], that's a fraud.'" (N.T. 51, 52.)

c. *Respondent had every reason to believe the lease was valid and enforceable.*

[A] was originally represented by [F], Esq., of the reputable law firm of [K], at the time of [A's] deposition in the [C] case. When respondent prepared and filed his first pleading in the [C] case, which was plaintiff's fifth amended complaint, [A's] prior attorney had previously filed a complaint and four amended complaints, at least the fourth of which already contained an allegation of loss of rental revenues pursuant to a 10-year lease. Thus, the claim of loss of rental profits was already an item of damages in the complaint prepared by [K]. Respondent had no reason to believe that the claim was anything but valid and based on valid and enforceable evidentiary documents.

The lease presented to respondent was prepared by a third-party real estate person, which further attests to the credibility of the document.

Even if the lease was entered into by parties standing in an employment relationship, this by no means indicates the lease was fraudulent, since an employer and employee can effectuate an arms-length transaction.

Petitioner failed to establish that respondent received information clearly establishing that the lease was fraudulent or that the circumstances surrounding the execution of the lease were fraudulent. Nor did petitioner establish that the alleged shielding of the on-going employment relationship between [G] and [A] rose to the level of

fraud. Petitioner did not establish that respondent's beliefs, as expressed by him, were unreasonable.

Petitioner has come forth with virtually nothing to indicate factors or reasons by which respondent should have known or opined other than he did regarding the testimony of [G], or that respondent's beliefs as to the validity of the lease were unreasonable. Petitioner's burden of clear and satisfactory proof by a preponderance of the evidence has not been met.

### 3. Respondent Informed the [C] Tribunal of the Employment Relationship Between [G] and [A]

One year after the alleged inconsistency, respondent attended a settlement conference with the presiding judge, Judge [J], in which each side spoke with the judge alone. Respondent and the judge focused on the issue of whether or not Pennsylvania law could be changed through this case to allow for punitive damages against an insurance company who negotiates in bad faith with an insured party. The judge indicated the case could not go to the jury on the issue of punitive damages.

Respondent mentioned to Judge [J] at this meeting that it turned out in the City deposition that the lessee may in fact, have been the employer of [A].

Neither the judge nor respondent pressed this point for several obvious reasons:

(i) That the employer was the lessee did not render the lease invalid;

(ii) The employment relationship did not indicate fraud;

(iii) Discussions focused on the crux of the case—the punitive damages issue. At this point, the lease was of minor importance to the case;

(iv) The judge was adamant that the case was only worth about $19,000 on property damage done. Respondent agreed and took this information back to his client.

Although respondent did reveal the testimony of an employment relationship, he had no duty to do so. D.R. 7-102(B)(1) states that a lawyer shall reveal to the effected person or tribunal a fraud perpetrated by his client. As has been shown, the inconsistent statements by [G] and [A] perpetrated no fraud and were akin to a misstatement of a non-material issue.

B. *The Finding of the Hearing Committee that Respondent Violated D.R. 2-110(B)(2) Was in Error*

The Hearing Committee found that respondent violated D.R. 2-110(B)(2) by failing to withdraw from employment after it became obvious that the lost profits claim was based upon a lease, the validity of which was supported only by the false testimony of [G]. This finding is in error for several reasons:

(1) The validity of the lease that formed the basis of the lost profits claim was not supported *only* by the false testimony of [G]. The validity of the lease was supported by several independent factors:

(a) It was a signed and dated written instrument;

(b) It was handled and approved by an independent real estate person;

(c) It contained all the elements of a valid and legally binding contract, including offer, acceptance and consideration;

(d) [A's] prior counsel, [K], concluded, after due consideration, that the lease was valid and enforceable; and

(e) Arms-length and valid transactions can be entered into by those other than complete strangers, including employers and employees.

D.R. 2-110(B)(2) states that a lawyer must withdraw from employment if it is obvious his continued employment will result in violation of a Disciplinary Rule. As previously discussed, at all time relevant hereto, it was never obvious to respondent that his continued employment would result in the violation of a Disciplinary Rule.

## C. *Respondent Did Not Engage in Any Conduct that Adversely Reflects on His Fitness to Practice Law and, Therefore, Did Not Violate D.R. 1-102(A)(6)*

Petitioner has not established by a preponderance of the evidence that is clear and satisfactory that respondent violated any Disciplinary Rules. Thus, he engaged in no conduct adversely reflecting on his fitness to practice law. Had any deposition statements by [G] and [A] in the City case at all indicated to respondent that an actual fraud was being committed, respondent would have directly informed the defendant and the tribunal. Indeed, testimony in the City depositions that an employment relationship existed between [A] and [G] by no means indicated to respondent that the lease was fraudulent.

Respondent inherited his client's claim for lost profits from his client's previous counsel. He retained this claim as there was no indication whatsoever that it was based on a fraud and in an effort to be the zealous advocate that D.R. 7-101(A) requires of him, to have dropped the claim without more than the existence of a shielded employment relationship, would have been legal malpractice on his part.

## V. DETERMINATION

The Disciplinary Board of the Supreme Court of Pennsylvania has determined that the charges against respondent be dismissed.

Ms. Flaherty did not participate in the adjudication.

ORDER

And now, May 13, 1993, upon consideration of the report and recommendation of Hearing Committee [    ] filed May 13, 1992, and after oral argument before a three-member panel of the Disciplinary Board, it is hereby ordered that the charges filed against [respondent], docketed at no. 140 D.B. 89, be dismissed.