IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 24, 2024

## RODERICK BATES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 301863    Barry Steelman, Judge**

_____

### No. E2023-00278-CCA-R3-PC

_____

The Petitioner, Roderick Bates, appeals from the Hamilton County Criminal Court's denial of his post-conviction relief from his jury-trial convictions for especially aggravated burglary and first degree murder, for which he is serving an effective life sentence. On appeal, he contends that the post-conviction court erred in denying relief for his ineffective assistance of counsel claims. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

William M. Speek and Jonathan T. Turner, Chattanooga, Tennessee, for the appellant, Roderick Bates.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Coty G. Wamp, District Attorney General; and P. Andrew Coyle, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner's convictions relate to the fatal shooting of Reginald Clark. *See State v. Roderick Quatel Bates and Emmett Jones*, No. E2014-01741-CCA-R3-CD, 2015 WL 9019818, at *1 (Tenn. Crim. App. Dec. 15, 2015), *perm. app. denied* (Tenn. May 5, 2016). The Petitioner was tried jointly with his codefendant, Emmett Jones, and both were convicted of especially aggravated burglary and first degree murder. *See id.* The evidence at the trial showed that the Petitioner and the victim were involved in an altercation at a nightclub after the victim's friend, Marterrious Daniel, commented to the Petitioner's girlfriend about her attire, in response to which she doused Mr. Daniel with a drink. *See id.* The Petitioner told Mr. Daniel to stay away from the Petitioner's girlfriend, and in

response, the victim raised his shirt to show the Petitioner that he had a gun in his waistband. *Id.* Later the same evening, the Petitioner and his codefendant went to the victim's home, entered with guns drawn, and shot the victim, who was struck three times. *Id.* at *1-2. Mr. Daniel, Larinder Lewis,[1] and Michael Ford were inside the home during the incident. *Id.* A cigar butt was recovered from the street outside the victim's home, and the Petitioner's DNA was identified on the butt. *Id.* at *2. In a statement to police which was admitted as substantive evidence at the trial, Larinder Lewis identified the Petitioner and the codefendant as the armed intruders who shot the victim. *Id.* On appeal of their convictions, the Petitioner and his codefendant raised issues related to the admission of evidence and to the sufficiency of the evidence. *Id.* This court affirmed, and the supreme court denied the Petitioner's and his codefendant's respective applications for permission to appeal. *See id.*

With the assistance of counsel, the Petitioner filed a petition for post-conviction relief, which he later amended. As relevant to this appeal, the petition and amended petition alleged that the Petitioner received the ineffective assistance of trial counsel in the following respects: (1) counsel failed to make an adequate opening statement and a closing argument, (2) counsel failed to cross-examine key State's witnesses, (3) counsel failed to conduct a proper pretrial investigation, (4) counsel failed to address the DNA evidence properly, and (5) prejudice resulted from counsel's cumulative deficiencies of performance.

At the post-conviction hearing, trial counsel testified that he and the codefendant's attorney agreed to present a joint defense and did not want to be "duplicitous to confuse the jury or mislead the jury or anything of that nature." Counsel said his practice after being appointed to represent a client was to communicate with them, understand the evidence, obtain any preliminary hearing information, and file a discovery motion.

Trial counsel testified his defense theory in the Petitioner's case was to attack the State's eyewitness identification evidence. Counsel said the identity evidence more strongly implicated the codefendant than the Petitioner. Counsel said that "we" spoke with "Cort," Sanford Ballou, and Michael Battle but that speaking with Larinder Lewis proved difficult because she was in protective custody in Nashville. Counsel said that Larinder Lewis "was the number one witness" for the State but that "we" did not know if she was going to be called to testify. Counsel said he had known after reviewing the preliminary hearing evidence that the Petitioner faced "an uphill battle" due to the eyewitnesses' identification of him as one of the shooters. Counsel did not recall a potential witness named Brent Rogers.

---

[1] Because Larinder Lewis and her sister, Palata Lewis, are discussed in this opinion, we will refer to them by both first and last names throughout for clarity.

Trial counsel testified that he met several times with the Petitioner at the jail and several times on court dates. Counsel estimated that they met fifteen to eighteen times to discuss trial strategy and the evidence. Counsel said he "disagree[d] completely and 100 percent" with the allegation that he only met with the Petitioner two or three times. Counsel said the jail records might not indicate all of his jail visits because the jailers knew him and did not always require him to sign in and sign out when he visited clients.

Trial counsel testified that he had no basis upon which to challenge the forensic evidence consisting of the Petitioner's DNA on a cigar butt found near the victim's home. Counsel said he consulted a defense expert, who opined that the forensic testing had been conducted correctly. Counsel said the expert was able to explain to the jury that the evidence could have been at the scene for some period of time before the crimes. Counsel said he attempted to explain the presence of the Petitioner's DNA with evidence that the Petitioner frequented the area, which was also where the Petitioner's mother lived.

Trial counsel testified that he did not make a closing argument as part of a coordinated strategy with the codefendant's counsel. He said that he and the codefendant's counsel discussed this strategy in their clients' presence. Counsel said that he and the codefendant's attorney "did not want to further complicate any issues," given that one of the prosecutors was particularly skilled in making closing arguments. Counsel explained, "We felt it would be cleaner if one person gave a closing and possibly put [the prosecutor] on his heels by [counsel's] not giving a closing." Counsel characterized the decision as "a global decision with the input of both clients." Counsel did not recall the Petitioner's having objected to the strategy and said he was sure he would have remembered if the Petitioner had objected. Counsel said the codefendant's counsel had given a "very thorough" closing argument which "went through all of the evidence. Witness-by-witness[.]" Counsel did not recall if the codefendant's counsel mentioned the Petitioner by name in his closing argument or how many times the codefendant's counsel mentioned the codefendant.[2] Counsel said he thought they had "raised" reasonable doubt, in view of the witnesses who testified, "I don't know who did it," the DNA evidence, and evidence of the similarity between the Defendant's nickname and that of a third party. Counsel said he had not wanted to argue and "put anymore [sic] undue focus" on the Petitioner.

Trial counsel testified that the defense strategy had been fluid because of the uncertainties surrounding the case. As an example of the uncertainties, he recalled that a witness "was literally drug into this [witness] box . . . kicking and screaming and telling His Honor, I don't want to testify, I don't want to testify." Counsel said he and the Petitioner discussed that counsel would have to "attack [the eyewitnesses'] ability to see."

---

[2] The trial record reflects that, in the defense closing argument, the codefendant's counsel mentioned both his client and the Petitioner by name and referred to the actions of both.

Counsel said the eyewitnesses had been certain of their identification of the Petitioner at the preliminary hearing but that they had been "180 degrees opposite" in their trial testimony, which led to the shifting defense strategy during the trial, including counsel's decision not to cross-examine some witnesses. Counsel said Mr. Ballou testified at the preliminary hearing that both suspects wore black, including black hoodies.

Trial counsel testified that Larinder Lewis was a critical witness for the State, having been in the victim's home when the crimes occurred and having made a pretrial identification of the Petitioner and the codefendant as the perpetrators. Counsel said that, due to the defense's inability to locate Larinder Lewis, he had prepared "an unavailability motion" but had not filed it because the State eventually located her in Nashville. He recalled that because the defense had not been able to speak with Larinder Lewis, the court afforded the defense a hearing to conduct voir dire of her before she testified. Counsel said Larinder Lewis's pending criminal charges had been resolved before she testified. He said she "testified and pled the Fifth."[3] Counsel said that the jury shook its heads at this and that he did not want to risk cross-examining her and "potentially . . . putting something before the jury that may rehabilitate her."[4] He did not recall discussing this with the Petitioner and said it was a decision made "in the heat of trial." Counsel said, "I don't see why I would still question her even over his objection because she hadn't identified him."[5] Counsel said that his strategy for cross-examination was informed by Larinder Lewis's "behavior" during her direct examination.

Trial counsel testified that he had not introduced evidence about DNA from an unknown source found inside the pocket of a black and orange jacket collected at the scene. Counsel said he did not think this evidence was relevant because the evidence showed that the Petitioner had been with his girlfriend earlier on the night of the shooting and because the defense expert explained that the Petitioner's DNA on the cigar butt "could have been left at any time." Counsel did not have a specific recollection of discussing the DNA evidence with the Petitioner but recalled that he and the Petitioner had "communications"

---

[3] During her trial testimony, Larinder Lewis was asked about her activities following the shooting. When questioned about how she could remember these events but could not recall the shooting itself or a pretrial statement she gave to a detective, she inquired if she could "plead the Fifth." The trial court instructed her that she could not and that she was to answer the questions as best she could. *Roderick Quatel Bates*, 2015 WL 9019818, at *10.

[4] The trial transcript reflects that the codefendant's counsel cross-examined Larinder Lewis and that trial counsel did not cross-examine her. When she attempted to invoke her Fifth Amendment privilege, both trial counsel and the codefendant's counsel objected to the court's ruling that she was unable to invoke the privilege.

[5] We have reviewed the trial transcript, which reflects that Larinder Lewis recalled that, as she was getting out of a car and going to the victim's home before the shooting, she saw the Petitioner driving a car which turned onto the victim's street, which she also knew was home to some of the Petitioner's relatives.

about it.  Counsel said he was "sure [he and the Petitioner] talked about it" when counsel filed the motion for approval for funding of a defense expert.

Trial counsel testified that although he did not specifically recall providing the discovery materials to the Petitioner, counsel's practice was to do so.  Counsel recalled that the discovery had been voluminous and had included "digital stuff," and he said he did not know how he would have provided the "digital stuff" to the Petitioner, who was in jail.  Counsel had no specific recollection of reviewing the discovery with the Petitioner but said it was his practice to do so in every case.

Regarding his opening statement, trial counsel testified that he did not elaborate on the testimony that defense witnesses might give because he did not want to risk promising the jury would hear something that they might not ultimately hear.  Counsel thought juries did not respond favorably when an attorney forecasted evidence in an opening statement that was later not introduced at the trial.

Trial counsel testified that neither the Petitioner nor the codefendant testified at the trial.  Counsel said that the Petitioner never indicated that he wanted to testify and that counsel agreed with the Petitioner's decision not to testify.  Counsel said the Petitioner had stated during the *Momon* hearing that the Petitioner and counsel "had several communications and contact . . . on the issues relevant to the trial, leading up to the trial." *See Momon v. State*, 18 S.W.3d 152 (Tenn. 1999).

The transcript of the Petitioner's trial was received as an exhibit.

The Petitioner testified that he was in pretrial custody for about two and one-half years, during which trial counsel visited him three times at the jail for no more than twenty minutes per visit.  The Petitioner said his mother was always able to reach counsel when the Petitioner had his mother contact counsel with messages from the Petitioner.

The Petitioner testified that during their second jail meeting, trial counsel gave him the twenty- to thirty-page discovery packet, which they did not discuss at this point.  The Petitioner said they did not discuss strategy or an alibi defense at this meeting. The Petitioner said that, at the third jail meeting, counsel advised him of efforts to locate and interview Larinder Lewis and Mr. Daniel.  The Petitioner said they also discussed the DNA evidence on the cigarette butt.  The Petitioner said he was concerned that the jury would think he committed the crimes because of the DNA evidence and that the Petitioner wanted counsel to explain to the jury that the butt had been found at an intersection, not at the scene of the shooting.  The Petitioner said he and counsel did not discuss strategy during the third jail meeting.  The Petitioner said counsel was still trying to locate Larinder Lewis at this point.  The Petitioner said he had faith in counsel and assumed from counsel's lack of discussion of strategy that no "bad news" existed.  The Petitioner acknowledged that he

saw counsel on court dates. He said they met four or five times in the holding cell in the presence of other inmates.

The Petitioner testified that, at the trial, he wanted trial counsel to question Larinder Lewis but that counsel did not because counsel believed it would be detrimental to the defense. The Petitioner said that he wanted counsel to make a closing argument to highlight the location of the cigar butt with DNA as being away from the scene of the shooting. The Petitioner acknowledged that the location where the cigar butt was collected was listed in the Tennessee Bureau of Investigation laboratory report, which was admitted as evidence, but he said this "wasn't enough." He said counsel did not explain the decision not to make a closing argument.

The Petitioner testified that he had been frustrated by what he perceived as counsel's lack of representation of him and had an "outburst" due to his frustration with counsel. The trial transcript reflects that when court recessed at the close of the proof, the Petitioner uttered a curse word, and trial counsel assured the judge that he would address it with the Petitioner before court reconvened. After the jury deliberated and its first degree murder verdict was being read the following day, the Petitioner stated, "F--- them." The codefendant stated, "I mean, y'all can get me up out of here, man," and the Petitioner stated, "Y'all c------- done railroaded a n-----, man." The court admonished the Petitioner and the codefendant to sit, and the Petitioner repeated that he had been "railroaded." The codefendant stated repeatedly, "This some b-------." The Petitioner repeatedly cursed and made allegations that the verdict had been racially motivated, and the codefendant continued to express his mutual dissatisfaction with the verdict. The Petitioner did not comment on any dissatisfaction with counsel.

After the court admonished the Petitioner and the codefendant not to speak again, the Petitioner said, "Gonna give me the life anyway, so f--- it." The court instructed the bailiffs to remove the Petitioner, and the codefendant expressed his desire to be removed from the courtroom, as well, and used profanity to characterize the proceedings. The court recessed, and the Petitioner and the codefendant were removed from the courtroom. When court was reconvened, the judge obtained assurances from the Petitioner and the codefendant that they would not cause further disruption. The court then polled the jurors about their first degree murder verdict; the especially aggravated burglary verdict was read; and the jurors were polled. After the court sentenced the Petitioner and the codefendant to life for their first degree murder convictions, the codefendant called his counsel a profane name and a "dog," and the court held the codefendant in contempt and sentenced him to serve ten days.

The post-conviction court took the matter under advisement and issued a written order denying relief. This appeal followed.

The Petitioner contends that the post-conviction court erred in denying relief on the following ineffective assistance of counsel claims: (1) counsel failed to conduct a proper pretrial investigation, (2) counsel failed to make an adequate opening statement and a closing argument, (3) counsel failed to cross-examine key State's witnesses, (4) counsel failed to address the DNA evidence properly, and (5) he was prejudiced due to the cumulative effect of multiple deficiencies of performance by trial counsel. The State responds that the court did not err in denying relief. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2018). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2018). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice

prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

# I

## Pretrial Investigation

The Petitioner argues that post-conviction court erred in denying relief on his claim that trial counsel was ineffective in failing to conduct an adequate pretrial investigation of witnesses Brent Rogers, who was driving past the scene and saw individuals entering the victim's home, and Palata Lewis, Larinder Lewis's sister, who he argues could have provided evidence to impeach Larinder Lewis's credibility. The Petitioner argues that the lack of investigation resulted in these witnesses "being limited or excluded." The post-conviction court found the following relative to the investigation of these witnesses:

> To the extent, if any, that the Petitioner attributes the lateness of counsel's decision to call [Palata Lewis] and counsel's failure to call Mr. Rogers, the passing motorist, to lack of opportunity to communicate with counsel, he does not prove the causal connection by clear and convincing evidence. At the post-conviction hearing, the Petitioner did not question counsel about the issue. Nor did he testify himself about his greater or timelier knowledge of the witnesses or his lack of opportunity to communicate that knowledge to counsel. There is therefore no evidence that insufficient communication between counsel and the Petitioner was a factor in counsel's late decision to call [Palata Lewis] or failure to call Mr. Rogers.

### A. Brent Rogers

Regarding Mr. Rogers, the Petitioner argues that Mr. Rogers had given a pretrial statement in which he said that he saw two black men force their way into the victim's home and that the shorter man wore dark colors or black. The Petitioner states that he is shorter than the codefendant. The Petitioner argues that this would have contradicted Larinder Lewis's testimony that he wore an orange and black jacket, which jacket was recovered at the scene and which was the source of a third party's DNA, as shown by forensic testing. The Petitioner claims that if counsel had presented Mr. Rogers's testimony, "a gaping hole would have been blown into the State's argument that the [Petitioner] was at the scene of the crime." The State argues that, without any evidence to support the Petitioner's claim, the post-conviction court did not err in denying relief.

-8-

The Petitioner did not present evidence about this failure-to-investigate allegation at the hearing. He did not testify about it beyond his general dissatisfaction with the extent of his communication with counsel. The Petitioner also did not call Mr. Rogers as a post-conviction witness. Mr. Rogers's purported pretrial statement was not offered as a post-conviction exhibit.

The post-conviction court found the following:

[W]ith respect to Mr. Rogers, by the Petitioner's own account, Mr. Rogers' description of the perpetrators, their entry of the victim's house, and their flight from the scene was consistent with the other witnesses' descriptions of the perpetrators and events. Arguably, any advantage to the defense in eliciting testimony from Mr. Rogers could have been more than offset by the disadvantage to the defense in allowing the prosecution to elicit from a person with no apparent credibility issues corroboration of essential aspects of the accounts of witnesses with credibility issues. Considering the substantive nature of at least some of the communications between counsel and the Petitioner, the Petitioner's opportunity to explain the cigar tip, the lack of clear and convincing evidence of the Petitioner's lack of opportunity to communicate other information to counsel, Ms. Lewis' refusal at trial to repeat her pre-trial identification and the consequent inconsequentiality of more impeachment evidence from her sister, and the risk to the defense from Mr. Rogers' corroboration of essential aspects of other witnesses' accounts, the Court finds that any deficiency in counsel's performance in this respect was not prejudicial.

As we have stated, no proof was offered at the post-conviction hearing to establish what counsel could have learned about Mr. Rogers by consulting in more detail with the Petitioner; what investigating Mr. Rogers would have revealed beyond the information which may have been in the discovery materials; why trial counsel did not call Mr. Rogers as a trial witness; or how Mr. Rogers would have testified if he had been called as a defense witness. Counsel testified that he did not recall a person named Brent Rogers. When a petitioner claims that his trial counsel should have called a trial witness, the witness should testify at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). After receiving the witness's testimony, "the post-conviction court must determine whether the testimony would have been (1) admissible at trial and (2) material to the defense." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008). If the court finds that the witness's testimony would have been admissible and material to the defense at the trial, the court must then determine whether the witness was credible. *Id.*

Without Mr. Rogers's testimony at the post-conviction hearing about how he would have testified as a trial witness and in view of trial counsel's lack of recollection of Mr.

Rogers, no basis existed upon which the post-conviction court could have found that the failure to call Mr. Rogers as a trial witness was deficient or prejudicial to the Petitioner's defense. The Petitioner's failure to offer any evidence at the hearing related to this issue was, alone, fatal to this claim. Noting the lack of evidence that the Petitioner was not able to communicate with trial counsel, the post-conviction court found that the Petitioner failed to establish deficient performance by clear and convincing evidence. The court further concluded that no prejudice had been shown. The evidence does not preponderate against the court's findings in this regard. The record likewise supports the court's conclusion that the Petitioner did not receive the ineffective assistance of counsel in this regard. The Petitioner is not entitled to relief on this basis.

### B. Palata Lewis

The Petitioner argues that trial counsel provided ineffective assistance because he did not adequately investigate Palata Lewis, who he claims could have impeached the testimony of her sister, Larinder Lewis. The Petitioner argues that, despite having known since the preliminary hearing that Palata Lewis was a potential witness, trial counsel did not interview her until the night before she was scheduled to testify, notifying the State at 7:30 p.m. that evening of its intent to call her to testify the next day. The Petitioner argues that the trial court only allowed the defense to ask Palata Lewis two questions related to Larinder Lewis's credibility as a witness and that the court did not permit the defense to ask Palata Lewis about an alleged statement that Larinder Lewis was only testifying because of "advantages" she received relative to pending criminal warrants.

The trial record reflects that Larinder Lewis testified as a State's witness and that Palata Lewis testified as the first defense witness. Despite her pretrial identification of the Petitioner and the codefendant as the perpetrators, Larinder Lewis claimed at the trial that she no longer had sufficient memory of the shooting to make any identification of its perpetrators and that she did not recall making statements which inculpated the Petitioner in her pretrial statement. On direct examination by counsel for the codefendant at the trial, Palata Lewis testified that Larinder Lewis had a reputation for being untruthful. On cross-examination by the State, Palata Lewis said that Larinder Lewis had sometimes been truthful with Palata Lewis and that Palata Lewis sometimes conducted her own investigation to determine the veracity of Larinder Lewis's statements. Trial counsel then attempted to ask Palata Lewis about specific instances in which Larinder Lewis had been untruthful, and on the State's request, the trial court conducted a jury-out hearing about the admissibility of Palata Lewis's testimony about matters which were probative of Larinder Lewis's credibility. Trial counsel and the codefendant's counsel stated that they had not spoken with Palata Lewis until the night before she was called as a defense witness. After the voir dire of Palata Lewis, the court ruled that trial counsel could ask Palata Lewis about (1) whether Larinder Lewis had been truthful in other court proceedings and (2) an incident in which Palata Lewis made a police report based upon a statement made by Larinder Lewis

which Palata Lewis later learned was untrue. The court ruled that Palata Lewis could not testify about a purported statement by Larinder Lewis that she was going to testify in the present case because she was receiving "help" with outstanding criminal warrants. The court noted that when Larinder Lewis testified during the State's case-in-chief, she said she had not received any help in resolving her outstanding warrants in consideration for her testimony. The court observed that cross-examination of Larinder Lewis about the contrary statement to Palata Lewis would have been appropriate as questioning about a prior inconsistent statement pursuant to Tennessee Rule of Evidence 613 but was inadmissible hearsay if elicited from Palata Lewis. After the jury-out hearing, trial counsel continued his questioning of Palata Lewis, who testified that Larinder Lewis had testified falsely in other court proceedings and that Palata Lewis had called the police based upon a false statement made by Larinder Lewis.

The Petitioner's ineffective assistance of counsel claim focuses on trial counsel's failure to interview Palata Lewis before Larinder Lewis's testimony, which he argues would have resulted in discovery of the alleged prior statement of Larinder Lewis that she had received consideration for her testimony in the form of help with her outstanding criminal warrants. He argues that this impeachment evidence would have undermined Larinder Lewis's credibility about the events she claimed to have observed on the night of the crimes. The post-conviction court made the following findings:

> [W]ith respect to [Palata Lewis], the Petitioner faults counsel for not seeking a witness to impeach [Larinder] Lewis, the sole eyewitness definitively placing him at the scene, until it was "too late." The amended petition avers that [Larinder] Lewis "had confirmed [to Palata Lewis] that the only reason that she was testifying in the current matter was because of certain preferential treatment and benefits that she was receiving in other criminal matter [sic] that she was facing and [Palata Lewis]'s "testimony was explosive and detrimental to the State's reliance on [Larinder Lewis's] testimony . . .."
>
> The jury, however, was aware that, before she testified, [Larinder] Lewis had been treated favorably by not having been arrested on outstanding warrants. In addition, [Palata Lewis] was called in the co-defendant's case in chief. After the prosecution objected for lack of notice, her testimony was proffered in a jury-out hearing. Thereafter, the jury heard [Palata Lewis's] testimony that [Larinder] Lewis had a reputation in the community of untruthfulness, had previously testified falsely in court proceedings, and had previously made a false statement to the sister that resulted in the sister's calling police.

The damage to the defense from [Larinder] Lewis was not from her testimony at trial or counsel's underutilization of her sister's impeachment evidence. At trial, she did not inculpate the defendants. In the prosecution's case in chief, she said that she did not know who shot the victim and, when questioned about her previous identification and whether she was telling the truth at trial or had told the truth to police, said, "It's been two years ago, and I just can't a hundred percent sure say no more." The damage to the defense from [Larinder] Lewis was from her recorded pre-trial identification of both defendants, which was admissible, . . . and relatively unimpeachable because it was made before she received any favorable treatment or had a motive to lie, and perhaps the apparently genuine fearfulness that she expressed and conveyed on the witness stand.

[Footnote omitted.]

Trial counsel testified at the post-conviction hearing that he had not cross-examined Larinder Lewis because the jury had appeared unreceptive to her testimony, with the jurors shaking their heads when she attempted to invoke her Fifth Amendment privilege, and he had not wanted to risk asking her something that might allow her credibility to be rehabilitated. Counsel characterized this as a decision made quickly as events unfolded during the trial. Palata Lewis later testified as a defense witness, and her testimony further impugned Larinder Lewis's credibility, both by highlighting Larinder Lewis's reputation for untruthfulness and by demonstrating her untruthfulness in two specific instances. The post-conviction court was not persuaded that impeachment of Larinder Lewis with a prior statement about a purported motive for her testimony would have been helpful to the defense.

Following the court's logic, the defense would not have been in an improved position if trial counsel had spoken with Palata Lewis before Larinder Lewis testified. Even if Larinder Lewis had been impeached about the motive for her testimony, the defense would still have had to contend with the identification evidence from another witness. The record supports the post-conviction court's findings that counsel did not perform deficiently and that the Petitioner had not established prejudice. These findings support the court's conclusion that the Petitioner failed to establish that he received the ineffective assistance of counsel in this regard. The Petitioner is not entitled to relief on this basis.

## II

### Opening Statement and Lack of a Closing Argument

The Petitioner contends that trial counsel provided ineffective assistance by making only a brief opening statement and in declining to make a closing argument. At the post-

conviction hearing, trial counsel explained that he did not give a more in-depth opening statement because he did not think juries responded favorably to an attorney's forecast of anticipated trial evidence if the evidence was not later introduced. Counsel noted the uncertainties in the anticipated witnesses' testimony and the need for the defense to remain flexible in responding to the State's proof. With regard to his decision not to make a closing argument, counsel explained that he and the codefendant's counsel conferred with each other and with their respective clients about the strategy of having the codefendant's counsel make the closing argument on behalf of the defense. Trial counsel said that he thought the defense had raised sufficient issues to suggest reasonable doubt and that the codefendant's counsel had given a thorough closing argument which outlined all of the evidence.

The post-conviction court made the following findings:

Counsel did make an opening statement. Although the statement was more a continuation from than a repetition of the appeal to reason in the opening statement of the co-defendant's lawyer, it was respectful of everyone's time and appropriate. Although it was more general than specific, it was reasonable not to risk the credibility or flexibility of the defense when there was uncertainty about the evidence at trial. Despite its brevity, counsel's statement did serve the important functions of formally introducing the defense for the Petitioner and establishing its basis in reason. The Court finds that counsel's performance in this respect was not deficient.

As for closing argument, counsel did not waive closing argument so much as adopt codefendant Jones' closing argument. It is unusual for counsel not to make a closing argument, but it is not automatically ineffective or presumptively prejudicial. *See Bell v. Cone*, 535 U.S. 685, 697-8, 122 S. Ct. 1843, 1851-2, 152 L.Ed.2d 914 (2002) (classifying the waiver of closing argument as subject to *Strickland's* performance-and-prejudice standard); *Tidwell v. State*, No. 01C01-9307-CR-00201, 1994 WL 548708, *10 (Tenn. Crim. App. 10/06/1994) (describing the majority of jurisdictions that have considered the issue as having held that "waiver of closing argument is not ineffective assistance of counsel per se and is, in fact, a valid trial tactic in certain situations") (*citing State v. Menn*, 668 S.W.2d 671, 673 (Tenn. Crim. App. 1984); *Ahdall v. Greer*, 764 F.2d 462, 466 (7th Cir. 1985); *Shockley v. State*, 565 A.2d 373, 1380 (Del. 1989); *Sparks v. State*, 499 N.E.2d 738, 742 (Ind. 1986); *State v. Bojorquez*, 675 P.2d 1314, 1319 (Ariz. 1984); *Lowe v. State*, 779 S.W.2d 334, 336 (Mo. App. 1989)).

The Petitioner suggests now that counsel could have argued the inconclusiveness of the DNA evidence. The co-defendant's lawyer,

however, did argue the inconclusiveness of the DNA evidence as well as the lack of physical evidence at the scene. While repetition may make the theory of the defense more memorable, it does not necessarily make it more persuasive.

Considering that more important was the immediately preceding incident at the club and a perpetrator's reference to it, [Larinder] Lewis' prior familiarity with and initial identification of the perpetrators, and Mr. Ballou's prior familiarity with co-defendant Jones and description of the second perpetrator, the Court finds that any deficiency in counsel's performance in this respect was not prejudicial.

We have reviewed the trial transcript, which reflects that trial counsel gave the last of the three opening statements. The prosecutor outlined the anticipated proof. The codefendant's counsel stated that he did not like to forecast the evidence which might be presented but that the jurors should think critically, pay attention to the identity proof and issues related to witness credibility, and refrain from making up their minds until they deliberated together. Trial counsel stated that he did not want to reiterate the prosecutor's or the codefendant's counsel's statements but urged the jury to pay attention to the proof and to be mindful of the State's burden to prove guilt beyond a reasonable doubt.

In the State's closing argument, which spans less than five pages of the transcript, one of the prosecutors outlined her theory of this case, focusing on the identification evidence and why this evidence was credible. The codefendant's counsel gave a detailed closing argument attacking the State's proof. The codefendant's counsel noted the lack of forensic evidence tying the codefendant and the Petitioner to the crimes and argued that the Petitioner's DNA on the cigar butt was explained by the Petitioner's living in the neighborhood. The codefendant's counsel noted the lack of inculpatory DNA evidence on the orange and black jacket. The codefendant's counsel argued that the State's evidence showed that the incident at the victim's home happened quickly. The codefendant's counsel highlighted the inability of some witnesses to make an identification and the reasons counsel posited that the identity witnesses were not credible. The codefendant's counsel explained the Petitioner's and the codefendant's flight from the scene as a function of their "liv[ing] in a different world" in which a person avoided contact with the police or other authority figures. When it was the Petitioner's turn for a closing argument, trial counsel stated, "[The codefendant's counsel] said it best, Your Honor. I have no further statements." A second prosecutor gave a rebuttal argument, which was more detailed than the State's initial closing argument and focused on the proof the State contended proved the Petitioner's and the codefendant's identities as the perpetrators and the proof which the State theorized demonstrated that the homicide of the victim had been premeditated.

-14-

At the post-conviction hearing, trial counsel explained his decisions to make a brief opening statement and to waive closing argument as matters of trial strategy. Counsel explained his underlying rationale. *See Adkins*, 911 S.W.2d at 347; *see also Pylant*, 263 S.W.3d at 874; *Cooper*, 847 S.W.2d at 528. The post-conviction court found that counsel had not performed deficiently in making the opening statement. The court did not make an explicit finding regarding deficient performance relative to the waiver of the closing argument, although the court noted that the decision not to make a closing argument was not ineffective assistance of counsel per se and found that the Petitioner had not established prejudice from the lack of a closing argument. *See Goad*, 938 S.W.2d at 370 ("Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim."). Thus, the court concluded that the Petitioner had not proven by clear and convincing evidence that he received the ineffective assistance of counsel.

The record supports the court's findings and conclusions. Trial counsel explained his rationale for the decisions he made. His opening statement was concise and did not promise evidence that the defense may not have been able to develop. The codefendant's counsel gave a thorough closing argument which addressed the proof relative to both the codefendant and the Petitioner, and trial counsel made a strategic decision not to make a redundant closing argument and thought his waiver of a closing argument gave the State less time to prepare its rebuttal argument. The post-conviction court did not err in denying relief. The Petitioner is not entitled to relief on this basis.

### III

### Cross-Examination of Key State's Witnesses

The Petitioner contends that he received the ineffective assistance of counsel because counsel did not adequately cross-examine three State's witnesses: Larinder Lewis, Marterrious Daniel, and Officer Russell. Larinder Lewis and Mr. Daniel were present at the nightclub when the initial altercation occurred and were at the victim's home at the time of the shooting, and Officer Russell collected evidentiary items at the scene and identified the cigar butt, a photograph of the cigar butt, and the orange and black jacket when the items were introduced as trial evidence.

#### A. Larinder Lewis

As we have stated, Larinder Lewis gave a pretrial statement in which she identified the Petitioner as one of the shooters, but she did not identify him at the trial, claiming insufficient recollection of the shooting and of having given the pretrial statement. The codefendant's counsel cross-examined Larinder Lewis, but trial counsel did not. At the post-conviction hearing, trial counsel said he noticed the jury's negative reaction to

-15-

Larinder Lewis's attempt to invoke her Fifth Amendment privilege and made a strategic decision not to risk questioning her, given the possibility that she might say something to rehabilitate her credibility. The codefendant's counsel later called Palata Lewis as a witness, and her testimony impeached Larinder Lewis's character for truthfulness.

The post-conviction court made the following relevant findings:

> It is true that counsel did not cross-examine [Larinder] Lewis, the sole eyewitness to place the Petitioner at the scene. At trial, [Larinder] Lewis had no difficulty recalling the incident at the club and other events before or after the shooting but, despite a pre-offense familiarity with both defendants and identification of both defendants by name or nickname to police, did not identify either defendant. She variously attributed her inconsistency to passage of time, lack of memory, and unspecified fear and even tried to invoke her privilege against self-incrimination. Thus, her ambivalence and inconsistency were amply apparent to the jury.

> Counsel did not cross-examine [Larinder] Lewis because he did not regard clarification of any retraction and the reasons therefor worth the risk to the defense from the witness. Apparently, counsel did not consider cross-examining [Larinder] Lewis about her history of false report, perjury, or subornation of perjury, the details of which appear in the voir dire of her sister at trial.

> Even if counsel's performance in this respect was deficient, however, the Court finds that it was not prejudicial for two reasons. Firstly, eventually, the defense did call [Palata Lewis] and was allowed to ask her whether she believed that [Larinder Lewis] had testified falsely in prior court proceedings and had made a false police report. Secondly, [Larinder Lewis's] identification of the defendants was corroborated by Mr. Ballou's identification of co-defendant Jones and description of the second suspect and Mr. Daniel's eventual identification of the Petitioner's voice. Thirdly, [Larinder Lewis's] observation of the murder weapon, a revolver, was corroborated by the ballistics expert.

[Footnote omitted.]

The Petitioner did not call Larinder Lewis to testify at the post-conviction hearing. Absent her testimony at the post-conviction hearing, the post-conviction court could not know how she would have testified if trial counsel had cross-examined her at the trial. *See Black*, 794 S.W.2d at 757. The codefendant's counsel cross-examined her at the trial, and trial counsel testified at the post-conviction hearing about his strategy in declining to cross-

-16-

examine her. *See Adkins*, 911 S.W.2d at 347; *see also Pylant*, 263 S.W.3d at 874; *Cooper*, 847 S.W.2d at 528. The post-conviction court did not make a finding regarding whether trial counsel's performance was deficient, but the court found that the Petitioner failed to establish prejudice from counsel's decision not to cross-examine Larinder Lewis and denied relief. *See Goad*, 938 S.W.2d at 370. The record reflects that Larinder Lewis was an evasive and inconsistent witness for the State, that the codefendant's counsel cross-examined Larinder Lewis to further demonstrate her unreliability and lack of credibility as a witness, and that trial counsel made a strategic decision in not further cross-examining her in order to avoid the possibility of her rehabilitating herself. The record supports the post-conviction court's determination that the Petitioner failed to prove ineffective assistance of trial counsel as to this allegation.

## B. Marterrious Daniel

The Petitioner argues that the post-conviction court erred in denying relief on his claim that trial counsel provided ineffective assistance in not cross-examining Marterrious Daniel about (1) Mr. Daniel's identification of the Petitioner's voice as the person who made a statement at the victim's home, despite his having no acquaintance with the Petitioner until the night of the crimes, and (2) Mr. Daniel's inability to make a photograph identification of the Petitioner when the police questioned Mr. Daniel after the crimes.

The record reflects that Mr. Daniel had identified the Petitioner and the codefendant in his preliminary hearing testimony, but at the trial, Mr. Daniel claimed he had not been able to see the perpetrators due to smoke from the gunfire. At the trial, Mr. Daniel recalled that one perpetrator had "plaits" and facial hair and that the other said, "What's that s--- you hollering at the club?" When asked at the trial about his preliminary hearing identifications of the codefendant and the Petitioner as the perpetrators, Mr. Daniel claimed his previous testimony had been affected by confusion and stress. Mr. Daniel testified at the trial that he had not known the Petitioner before the incident at the club that night. Mr. Daniel acknowledged his voice on a recording of a 9-1-1 call and said he had not realized that another person had called 9-1-1 and that his voice had been recorded. He agreed that, on the recording, he and another witness discussed the codefendant's being one of the perpetrators. After the prosecutor reviewed Mr. Daniel's preliminary hearing testimony with him, Mr. Daniel agreed that he "now remember[ed]" the Petitioner as the person who asked the question about what the victim had said at the club. The codefendant's counsel cross-examined Mr. Daniel and was able to establish that, on the morning after the crimes, Mr. Daniel told the police that he could not identify the perpetrators. Codefendant's counsel asked Mr. Daniel, "So your testimony today is the same as it was at 8:13 that morning [after the crimes when giving a pretrial statement to the police]," and Mr. Daniel said, "Correct." Mr. Daniel agreed during trial counsel's cross-examination of him that he had not seen the perpetrators because he had been "[lying] on the ground."

Trial counsel was not asked at the post-conviction hearing about his decision not to cross-examine Mr. Daniel about the accuracy of his identification of the Petitioner's voice, despite Mr. Daniel's lack of familiarity with the Petitioner before the evening of the crimes, or about Mr. Daniel's inability to identify the Petitioner in photographs when Mr. Daniel was questioned by the police after the crimes.

The post-conviction court made the following relevant findings:

> [Trial] counsel did not cross-examine Mr. Daniel about his inability to identify the perpetrators from digital photographs and his belated identification of the Petitioner's voice, despite the circumstances of his sole prior exposure to the Petitioner's voice at the club. The cross-examination by the co-defendant's lawyer, however, was thorough, resulting in Mr. Daniel's equivocation and retraction of his pre-trial identification. Furthermore, there was no evidence at the post-conviction hearing that more favorable information was available from Mr. Daniel. The Court therefore finds that any deficiency in counsel's performance in this respect was not prejudicial.

Relative to the question of deficient performance, the Petitioner failed to question trial counsel at the hearing about the decision to forego cross-examination of Mr. Daniel about his identification of the Petitioner's voice and about Mr. Daniel's inability to identify the Petitioner in photographs. Relative to the question of prejudice, the record reflects that both trial counsel and the codefendant's counsel conducted cross-examination of Mr. Daniel, highlighting the fact that Mr. Daniel did not see the perpetrators and did not identify the Petitioner and the codefendant when he was questioned by the police on the morning after the crimes. The post-conviction court found that the codefendant's counsel's cross-examination, in particular, had been thorough. The jury was aware that Mr. Daniel had no prior familiarity with the Petitioner, having first encountered the Petitioner earlier on the evening of the shooting at the nightclub where the initial altercation occurred. Any additional value in highlighting Mr. Daniel's relative unfamiliarity with the Petitioner's voice and appearance would have been insignificant, at best, given Mr. Daniel's testimony that he had not seen the perpetrators and the other identification evidence implicating the Petitioner and the codefendant. *See Roderick Quatel Bates*, 2015 WL 9019818, at *1-2. The record supports the post-conviction court's determination that the Petitioner failed to prove ineffective assistance of counsel as to this allegation.

### C. Officer Russell

The Petitioner argues that the post-conviction court erred in denying relief on his claim that trial counsel provided ineffective assistance in failing to cross-examine Officer Russell, who photographed and collected the cigar butt and the orange and black jacket.

The Petitioner posits that counsel failed to establish the precise location of the cigar butt in relation to the crime scene. In his brief, he makes no argument as to any topics about which he contends counsel should have cross-examined Officer Russell in relation to the jacket.

The Petitioner did not question trial counsel about this issue at the hearing. The Petitioner also did not call Officer Russell as a post-conviction witness in order to establish what his testimony would have been, had he been cross-examined at the trial about the matters of which the Petitioner now complains.

The post-conviction court made the following findings:

It is also true that counsel did not cross-examine Off. Russell about the scene. From other evidence, including counsel's examination of Dr. Action, however, it was clear to the jury as follows:

(1) that the cigar tip was found in an intersection near the scene, not at the scene;

(2) that the Petitioner frequented the neighborhood and could have dropped the cigar tip at another time;

(3) that, before the scene was secured, there were twenty or thirty people in the vicinity, any one of whom could have transferred the cigar tip to the location where it was found from another location; and

(4) that, apart from the cigar tip, no physical evidence connects either defendant to the scene.

The Court therefore finds that any deficiency in counsel's performance in this respect was not prejudicial.

As we have stated, the Petitioner presented no evidence about this issue at the hearing. *See Black*, 794 S.W.2d at 757. In the absence of clear and convincing evidence upon which to grant relief, the post-conviction court did not err in denying relief on this issue.

## IV

### Addressing DNA Evidence

The Petitioner contends that the post-conviction court erred in denying relief on his claim that trial counsel was ineffective because counsel inadequately addressed the DNA

evidence. He argues that trial counsel did not cross-examine Dr. Boos, the State's expert witness, about her methodology in conducting DNA testing on the cigar butt. The Petitioner also argues that counsel did not develop evidence to establish the location where the cigar butt was found and that counsel should have "reiterated over and over to the jury and through witnesses' examination" that the Petitioner lived nearby and that the scene could have been contaminated by people at the scene transporting the cigar butt on their shoes to the location where it was recovered. The Petitioner argues, as well, that trial counsel failed to highlight the evidence that the orange and black jacket contained DNA that was identified as not being from the Petitioner. The State responds that the court did not err in denying relief. We agree with the State.

Trial counsel testified at the hearing that he retained a defense expert, who found no fault with the State's DNA testing methodology. Counsel testified about his strategy in addressing the DNA evidence, which was that the Petitioner's DNA on the cigar butt could be explained by the Petitioner's frequenting the area because a relative lived nearby, and that the butt was recovered from the street, not the victim's home. The trial record reflects that counsel elicited the following testimony from the defense DNA expert: "[I]f you obtain a DNA profile from an evidence item, that information does not give you any information about the time or the place or circumstances by which the biological material was deposited on that evidence item. There's no way you can determine that." Relative to the evidence related to the DNA found on the orange and black jacket recovered from the scene, the record reflects that the State's DNA expert witness testified at the trial that the jacket contained a DNA mixture from two individuals and that the DNA standards collected as evidence, which included the Petitioner's DNA standard, did not match the DNA profiles found on the jacket.

The post-conviction court stated the following in disposing of this issue:

*Cigar Tip*

The Petitioner alleges that trial counsel was ineffective in not trying to discredit the DNA evidence by establishing the location of the cigar tip relative to the scene or questioning the DNA experts about current methodologies, possible errors, and possible persistence of DNA in the circumstances.

Counsel did not cross-examine the prosecution's DNA expert for two reasons. Firstly, the defense expert did not give counsel any reason to question the prosecution expert's methods or analysis. Secondly, the co-defendant's lawyer did cross-examine the prosecution expert and, in the process, emphasize the cigar tip's location and possible presence in the street for some time before the offense. Considering that the inconclusiveness of

the relevance of the DNA on the cigar tip was apparent and there was no apparent advantage to the defense in additional questions about method, error, or persistence of DNA and even a disadvantage in pursuing inconsistent strategies with respect to the DNA evidence on the cigar tip and the jacket and thereby undermining the exculpatory results from the jacket, the Court finds that any deficiency in counsel's performance in this respect was not prejudicial.

*Jacket*

The Petitioner alleges that trial counsel was ineffective in not effectively informing the jury of exculpatory DNA on an orange-and-black jacket or objecting to the prosecutor's characterization of the jacket in closing argument as his when Mr. Daniel's preliminary-hearing testimony was that he was wearing a brown Polo jacket at the club. At trial, the evidence about an orange-and-black jacket was as follows:

(1) an orange-and-black jacket with DNA from two individuals other than the [defendant's] was found near the scene;

(2) on cross-examination, Det. Emery agreed that, according to [Larinder] Lewis' statement to police, the Petitioner was wearing an orange-and-black jacket at the club; and

(3) in a video recording from Waffle House after the shooting, the Petitioner was not wearing an orange-and-black jacket.

Thus, the jury was aware of the presence of a mixture of non-inculpatory DNA on the jacket. The Petitioner's allegation that "the State repeatedly argued to the jury that the Bengals jacket belonged to Petitioner and served as proof of his presence at the shooting" mischaracterizes the proceedings. The prosecution did not mention the jacket in opening statement or during its initial closing argument. Only after the co-defendant's lawyer argued that the Petitioner was not wearing the jacket in the video recording from Waffle House after the shooting and the mixture of DNA on the jacket exculpated the defendants did the prosecutor argue that the Petitioner was not wearing the jacket at the Waffle House because the jacket had been left at the scene. The State's sole reference to the jacket in argument was thus in rebuttal to the co-defendant's lawyer's argument.

As for counsel's failure to utilize Mr. Daniel's preliminary-hearing testimony that the Petitioner was wearing a brown Polo jacket at the club, he

-21-

did not question counsel about the omission or introduce a transcript of the preliminary-hearing testimony in issue. The Court therefore finds that any deficiency in counsel's performance in these respects was not prejudicial.

Upon review, we conclude that the evidence does not preponderate against the post-conviction court's factual findings. Trial counsel testified about his strategy in addressing the DNA evidence, which was based upon his having consulted with and presented the testimony of a defense expert. Counsel explained his defense theory relative to explaining the presence of the Petitioner's DNA on the cigar butt, which the trial evidence showed had been recovered on the street and not in the immediate area of the crime scene. *See Roderick Quatel Bates*, 2015 WL 9019818, at *2. The jury was aware that the DNA on the orange and black jacket did not come from the Petitioner because the State's expert witness testified to this fact. Because the record supports the post-conviction court's determinations, the court did not err in denying relief. The Petitioner is not entitled to relief on this issue.

## V

### Cumulative Effect of Deficiencies of Performance

The Petitioner contends that the post-conviction court erred in denying relief on the basis of cumulative deficiencies of performance resulting in prejudice, thereby establishing the ineffective assistance of counsel. The State responds that the court properly denied relief. We conclude that the record supports the court's determination.

The cumulative error doctrine requires relief when "multiple errors [are] committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

"[W]hen an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice" of an ineffective assistance of counsel allegation. *Timothy Terell McKinney v. State*, No. W2006-02132-CCA-R3-PD, 2010 WL 796939, at *37 (Tenn. Crim. App. Mar. 9, 2010), *perm. app. denied* (Tenn. Aug. 25, 2010); *see State v. Taylor*, 968 S.W.2d 900 (Tenn. Crim. App. 1997); *State v. Zimmerman*, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1991). More than one instance of deficient performance, when considered collectively, can result in a sufficient showing of prejudice pursuant to *Strickland*. *Timothy Terell*

*McKinney*, 2010 WL 796939, at *37; *see Taylor*, 968 S.W.2d at 909. The question is whether counsel's deficiencies "cumulatively prejudiced . . . the right to a fair proceeding and undermined confidence in the outcome of the trial." *Timothy Terell McKinney*, 2010 WL 796939, at *37. Counsel's failure to conduct adequate pretrial preparation and investigation may establish prejudice pursuant to *Strickland*. *Id.*

       In addressing this issue, the post-conviction court stated:

> The Court finds . . . that, individually, none of counsel's acts or omissions were prejudicial. Nor do those acts or omissions seem prejudicial to the Court even collectively.

> Again, from what the evidence at the post-conviction hearing includes and does not include, the Court gathers that the Petitioner continues to prefer misidentification to any other theory of the defense and challenges only counsel's execution of the strategy at trial. Counsel, however, did prepare and execute the strategy, consistent with the misidentification theory of the joint defense, of undermining the identifications by trying to impeach the credibility of the prosecution witnesses and exploit the lack of physical evidence against the defendants. By the conclusion of the proof and the arguments, the theory of the joint defense and the reasons to doubt the identifications were clear to the jury.

> Had the cigar tip been the only evidence against the Petitioner, he would not have been convicted. The identification of an eyewitness with a prior familiarity with a suspect, however, is not easy to overcome. Even a fully explored history of false report, perjury, and subornation of perjury may not overcome such an identification in cases, like the Petitioner's case, in which other eyewitnesses corroborate many details.

       The record supports the post-conviction court's determination that the Petitioner was not entitled to relief based upon the cumulative effect of counsel's alleged deficiencies. Trial counsel testified about his investigative efforts, his consultation with the Petitioner on factual and strategic matters, the decision to pursue a joint defense with the codefendant, and the decisions he made in the moment at the trial as the testimony and evidence were received. The Petitioner's post-conviction complaints focus, in part, on trial counsel's having pursued a joint defense theory and not having repeated points already covered by the codefendant's counsel. The joint defense theory focused on attacking the identity proof as to both the Petitioner and the codefendant. Because the record supports the post-conviction court's determination that the Petitioner was not prejudiced by the totality of his alleged deficiencies of counsel's performance, the Petitioner is not entitled to relief on this basis.

-23-

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE